Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/14/2020 09:06 AM CST

- 511 -

**Nebraska Supreme Court Advance Sheets
304 Nebraska Reports**
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

**State of Nebraska ex rel. Counsel for Discipline
of the Nebraska Supreme Court, relator, v.
Janet L. Krotter Chvala, respondent.**

___ N.W.2d ___

Filed November 22, 2019.    No. S-17-773.

1. **Disciplinary Proceedings: Appeal and Error.** Attorney discipline cases
   are original proceedings before the Nebraska Supreme Court. As such,
   the court reviews a referee's recommendations de novo on the record,
   reaching a conclusion independent of the referee's findings.
2. **Disciplinary Proceedings: Proof.** Violations of disciplinary rules must
   be established by clear and convincing evidence.
3. **Disciplinary Proceedings.** The basic issues in a disciplinary proceed-
   ing against an attorney are whether discipline should be imposed and,
   if so, the appropriate discipline evaluated under the particular facts and
   circumstances of the case.
4. **Disciplinary Proceedings: Appeal and Error.** When a party takes
   exception to the referee's report in a disciplinary proceeding, the
   Nebraska Supreme Court conducts a trial de novo on the record, in
   which the court reaches a conclusion independent of the findings of
   the referee; provided, however, that where the credible evidence is in
   conflict on a material issue of fact, the court considers and may give
   weight to the fact that the referee heard and observed the witnesses and
   accepted one version of the facts rather than another.
5. ____: ____. In a disciplinary proceeding, when a referee makes an
   express determination about the relative credibility of witnesses, the
   Nebraska Supreme Court gives weight to that determination in its de
   novo review, but it is not bound by it.
6. **Attorney and Client.** A lawyer is ultimately responsible for the conduct
   of his or her employees and associates in the course of the professional
   representation of the client.
7. ____. An attorney-client relationship with respect to a particular matter
   may be implied from the conduct of the parties.

- 512 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

8. **Attorney and Client: Proof.** Generally speaking, an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. In appropriate cases the third element of an attorney-client relationship may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it.

9. **Disciplinary Proceedings: Attorney and Client.** Generally speaking, any commercial activity engaged in for a profit will constitute a business transaction for purposes of the disciplinary provisions that prohibit an attorney from entering into a business transaction with a client.

10. **Disciplinary Proceedings: Attorney and Client: Real Estate: Words and Phrases.** For purposes of the disciplinary provisions that prohibit an attorney from entering into a business transaction with a client, "business transaction" is a broad term, and it plainly includes an agreement to purchase real property and an agreement to lease real property.

11. **Disciplinary Proceedings: Attorney and Client: Words and Phrases.** In the context of the disciplinary provisions governing business transactions with clients, a client is defined as one over whom the attorney has influence arising from a previous or current attorney-client relationship. Thus, a "client" in this context means not only one with whom the attorney has an existing attorney-client relationship, but also those who have relied on the attorney on an occasional and on-going basis.

12. **Disciplinary Proceedings: Attorney and Client: Conflict of Interest: Proof.** To establish a violation of Canon 5, DR 5-104(A), of the Code of Professional Responsibility, it is necessary to show that (1) the attorney and the client had differing interests in the transaction, (2) the client expected the lawyer to exercise his or her professional judgment for the protection of the client, and (3) the client consented to the transaction without full disclosure.

13. **Conflict of Interest: Words and Phrases.** Differing interests are interests that are conflicting, inconsistent, diverse, or otherwise discordant.

14. **Disciplinary Proceedings: Conflict of Interest: Words and Phrases.** In the attorney discipline context, the term "differing interests" has been broadly defined to include any interest adversely affecting either the lawyer's judgment on behalf of a client or the lawyer's loyalty to a client.

15. **Conflict of Interest.** It is fundamental that the interests of a purchaser in a transaction are directly contradictory to the interests of the seller in

- 513 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the transaction. Similarly, the competing interests of lessor and lessee necessarily present differing interests.

16. **Attorney and Client.** The nature of the transaction itself can show that the client expected the lawyer to exercise professional judgment for his or her protection. So, too, can the prior relationship of the attorney and the client.

17. \_\_\_\_. As a general matter, it is natural and proper for a client with a longstanding business relationship with a lawyer to feel that the lawyer is to be trusted, will not act unfairly, and will protect him or her against danger.

18. **Disciplinary Proceedings: Conflict of Interest.** For purposes of Canon 5, DR 5-104(A), of the Code of Professional Responsibility, a full disclosure requires both that the client is advised there is a conflict of interest and that the client is informed of the possible areas this conflict of interest may affect.

19. \_\_\_\_ : \_\_\_\_. A key part of a full disclosure under Canon 5, DR 5-104(A), of the Code of Professional Responsibility, is explaining to the client any effect the conflict may have on the exercise of the attorney's professional judgment. In other words, full disclosure means explaining the nature of the conflict presented by the attorney's role in the business transaction, and also explaining to the client why he or she would benefit from independent counsel.

20. \_\_\_\_ : \_\_\_\_. When a full disclosure is required under Canon 5, DR 5-104(A), of the Code of Professional Responsibility, it must include a clear explanation of the differing interests between the attorney and the client, a detailed explanation of the risks and disadvantages to the client as a result of those differing interests, and an explanation of the advantages of seeking independent legal advice.

21. \_\_\_\_ : \_\_\_\_. The full disclosure required by Canon 5, DR 5-104(A), of the Code of Professional Responsibility, is not satisfied by a mere disclaimer of an attorney-client relationship.

22. **Disciplinary Proceedings: Attorney and Client: Conflict of Interest.** Canon 5, DR 5-104(A), of the Code of Professional Responsibility, is designed to address the concern that an attorney's legal skill and training, together with the relationship of trust and confidence between the lawyer and client, create the possibility of overreaching when the lawyer participates in a business transaction with a client. This concern exists whether or not the attorney actually provides legal advice or services to the client in the business transaction.

23. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. To be effective, the full disclosure required by Canon 5, DR 5-104(A), of the Code of Professional Responsibility, must be made before the client consents to the business transaction.

- 514 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

24. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. Under Canon 5, DR 5-105, of the Code of Professional Responsibility, a lawyer may represent several clients whose interests are not actually or potentially differing, but should nevertheless explain any circumstances that might cause a client to question the lawyer's undivided loyalty.

25. **Attorney and Client: Conflict of Interest.** If a lawyer is asked to undertake or continue representation of multiple clients having potentially differing interests, the lawyer must weigh carefully the possibility that his or her judgment may be impaired or his or her loyalty divided if he or she accepts or continues the employment.

26. **Disciplinary Proceedings: Attorney and Client: Conflict of Interest.** Under Canon 5, DR 5-105(C), of the Code of Professional Responsibility, a lawyer may represent multiple clients with differing interests if (1) it is obvious the lawyer can adequately represent the interest of each and (2) if each client consents to the representation after full disclosure of the possible effect of such representation on the exercise of his or her independent professional judgment on behalf of each.

27. **Attorney and Client: Conflict of Interest.** Even in those instances where a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his or her need for representation free from any potential conflict and to obtain other counsel if he or she so desires.

28. \_\_\_\_ : \_\_\_\_. Before a lawyer may represent multiple clients, the lawyer should explain fully to each client the implications of the common representation and should accept or continue employment only if the client consents. And if there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he or she should also advise all of the clients of those circumstances.

29. **Disciplinary Proceedings: Attorney and Client: Conflict of Interest.** A full disclosure under Canon 5, DR 5-105, of the Code of Professional Responsibility, requires the attorney to not only inform the client of the attorney's relationship with other clients, but also to explain the pitfalls that may arise in the course of the transaction that would make it desirable for the client to have independent counsel.

30. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. For purposes of Neb. Ct. R. of Prof. Cond. § 3-501.7 (rev. 2019), informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. The information required depends on the nature of the conflict and the nature of the risks involved. When representation of

- 515 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality, and the attorney-client privilege and the advantages and risks involved.

31. **Attorneys at Law.** One of the essential eligibility requirements for admission to the practice of law in Nebraska is the ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations.

32. **Disciplinary Proceedings: Attorney and Client.** Attorneys who engage in dishonest or deceitful conduct in their communications with clients violate Neb. Ct. R. of Prof. Cond. § 3-508.4(c) (rev. 2016).

33. **Disciplinary Proceedings.** With respect to the imposition of attorney discipline, each attorney discipline case must be evaluated in light of its particular facts and circumstances.

34. ____. For purposes of determining the proper discipline of an attorney, the Nebraska Supreme Court considers the attorney's actions both underlying the events of the case and throughout the proceeding, as well as any aggravating or mitigating factors.

35. ____. In attorney discipline matters, the propriety of a sanction must be considered with reference to the sanctions imposed in prior similar cases.

36. ____. To determine whether and to what extent discipline should be imposed in an attorney discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law.

37. ____. Cumulative acts of attorney misconduct are distinguishable from isolated incidents, therefore justifying more serious sanctions.

38. **Attorney and Client.** Violations of client trust and loyalty, particularly when they result in personal financial gain to the attorney, harm the reputation of the entire legal profession by undermining public confidence and trust in attorneys, in the courts, and in the legal system generally.

39. **Disciplinary Proceedings: Attorney and Client.** There is a need to preserve the public trust and confidence in members of the bar. Among the major considerations in determining whether a lawyer should be disciplined is maintenance of the highest trust and confidence essential to the attorney-client relationship. As a profession, the bar continuously strives to build and safeguard such trust and confidence.

40. **Disciplinary Proceedings.** The goal of attorney discipline proceedings is not as much punishment as a determination of whether it is in the

- 516 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

public interest to allow an attorney to keep practicing law. Providing for the protection of the public requires the imposition of an adequate sanction to maintain public confidence in the bar.

41. ____. It is a very serious matter when attorney misconduct brings doubt into the minds of many as to the competence of the legal profession to represent a client's best interest.

42. ____. The Nebraska Supreme Court does not look kindly upon acts which call into question an attorney's honesty and trustworthiness. The essential eligibility requirements for admission to the practice of law in Nebraska include the ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations. With or without misappropriation, acts of dishonesty can result in disbarment.

Original action. Judgment of disbarment.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

David A. Domina, of Domina Law Group, P.C., L.L.O., for respondent.

Heavican, C.J., Miller-Lerman, Stacy, Funke, Papik, and Freudenberg, JJ.

Per Curiam.

This is an original action brought by the Counsel for Discipline of the Nebraska Supreme Court against attorney Janet L. Krotter Chvala, alleging she violated several disciplinary provisions and her oath as an attorney by, among other things, entering into business transactions with clients without providing the full disclosure mandated by the disciplinary rules and engaging in conduct involving deceit and dishonesty. Chvala denied the allegations. A referee was appointed, and an evidentiary hearing was held. The referee found clear and convincing evidence of multiple disciplinary violations and recommended that Chvala be disbarred. Chvala filed an exception to the referee's report, challenging both the findings and the recommended sanction.

On de novo review, we find clear and convincing evidence that Chvala violated several disciplinary provisions and her

- 517 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

attorney oath. And given the seriousness of the violations, we agree with the referee that the appropriate sanction for Chvala's misconduct is disbarment.

## I. BACKGROUND

Chvala has been licensed to practice law in Nebraska since 1984. She is an experienced, well-respected lawyer with a busy law practice focused primarily on business formation, real estate, and probate in the area of O'Neill and Atkinson, Nebraska. Chvala has not been the subject of any prior disciplinary action.

## II. FACTS

Brothers Wayne Kaup and Kurt Kaup operate several farming-related businesses in the O'Neill and Atkinson area. In the 7 years before the 2003 real estate transaction at the heart of this disciplinary action, Chvala regularly provided legal services to Wayne and Kurt and represented them in a variety of matters, including the purchase of farmland, the handling of crop liens, and the organization of business entities for hay operations, livestock operations, and hauling grain. Chvala also performed a variety of legal services for Wayne and Kurt's mother, Diane Kaup, during this time period.

### 1. Morrison Land

On January 2, 2003, Wayne and Kurt signed a contract to purchase a section of prime farmland in Holt County, Nebraska, known as the Morrison Land. The purchase price was $996,880.50. They put 5 percent down and sought private financing for the remainder of the purchase price.

Their mother, Diane, agreed to finance a quarter section of the land, and their aunt, Rita Olberding (Rita), agreed to finance another quarter section. Wayne and Kurt contacted Chvala at her law office and asked if she would be interested in hearing about an investment proposal regarding the Morrison Land. She said she was, and on January 12, 2003, Wayne and Kurt met with Chvala and her husband, Gary Chvala (Gary), at Chvala and Gary's home.

- 518 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

### (a) January 12, 2003, Meeting

It is undisputed that during the January 12, 2003, meeting at Chvala and Gary's home, Wayne and Kurt discussed their need to finance the Morrison Land purchase. But Chvala and the Kaup brothers disagree as to what specifically was said during the meeting.

According to Chvala, the meeting was primarily between Gary and the Kaup brothers. Chvala testified she merely introduced Wayne and Kurt to Gary, and then explained: "He's buying the property if he decides to do this. And I have done work for you in the past. And I cannot represent you in any capacity because God willing, he's always going to be my husband." According to Chvala, she was not otherwise involved in the January 12, 2003, meeting.

Wayne and Kurt testified that Chvala actively participated in the meeting and that she was the one with whom they negotiated. They denied that Chvala made any statement about it being only Gary's deal. Wayne testified that Chvala did most of the talking during the meeting and that Gary remained mostly silent. Wayne explained that although he and Kurt had approached Chvala about financing a quarter section, Chvala told them she was interested in two quarter sections (which total a half section) and did not want to loan them money. Instead, Chvala offered to purchase a half section of the Morrison Land and then lease it back to Wayne and Kurt with an option to purchase the land at the end of the lease term.

The parties discussed several ways to structure the arrangement. One proposal, made by the Kaup brothers, was that Chvala and Gary would receive a guaranteed 5-percent rate of return and the Kaup brothers would have an option to purchase for the fair market value of the land at the end of the lease term. However, they ultimately agreed Chvala and Gary would purchase the half section of the Morrison Land and lease it back to Wayne and Kurt pursuant to a 10-year triple-net lease that would guarantee a 7-percent rate of return to Chvala and Gary, with an option for the Kaup brothers to purchase the land

- 519 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

at the end of the lease term for the original purchase price. Both Wayne and Kurt testified that near the end of the meeting, Chvala told them the half section of land would be titled in Gary's name for estate planning purposes.

A few days after the January 12, 2003, meeting, and in reliance on the agreement reached with Chvala and Gary, Wayne and Kurt assigned their rights under the purchase agreement to Gary so he could purchase the half section of the Morrison Land. Wayne and Kurt executed similar assignments in favor of Diane and Rita for the respective quarter sections of the Morrison Land they planned to purchase.

Gary was a high school teacher and coach, and a respected member of the community. Prior to January 2003, he had not been involved in purchasing or leasing farmland. Gary died unexpectedly before the evidentiary hearing in this disciplinary case. But his deposition was taken in a related civil case filed by Wayne and Kurt against Chvala and Gary, and a transcript of that deposition was received as an exhibit during the disciplinary hearing. In his deposition, Gary testified he did not remember how the Morrison Land deal was first presented to him, but he consistently described it as "my land" and insisted that "[i]t has nothing to do with [Chvala], she's got her own situation."

Gary testified he and Chvala decided the Morrison Land would be titled in his name, but admitted that their "joint funds" were used to purchase the land and that Chvala was obligated on a promissory note for a substantial portion of the purchase price. Gary's deposition testimony also showed he was unfamiliar with virtually all the details of the deal. When asked whose idea it was to lease the property back to Wayne and Kurt, Gary said, "Well, I'm not really sure." Gary did not understand and could not explain the triple-net lease provisions, and when asked why he chose such a lease arrangement for the deal, Gary testified he got the idea from forms he had seen around Chvala's law office. Gary was not able to explain how he planned to make a profit on the investment as it was

- 520 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

structured. When pressed, he testified, "Well, my intent was that eventually I thought with a lease option that with the price of land going the way it was that eventually that I was going to make a profit on the whole situation. I wasn't going to run the thing just to break even."

> The referee found, based on Gary's testimony, that it was
> hard to believe that Gary, who had no experience in buy-
> ing and leasing farm ground, initiated the idea of not
> loaning the Kaups the money, but rather buying the land
> and then leasing it to the Kaups on a 10-year triple net
> lease with an Option to Purchase at the end of 10 years.

The referee further found that Wayne and Kurt's testimony about the discussions and agreements reached during the January 12, 2003, meeting was credible, and he expressly found that Chvala's testimony was not credible.

### (b) Closing on Morrison Land

Closing on the Morrison Land occurred in February 2003. Gary became the titled owner of a half section of the Morrison Land, which he purchased for $497,637. To finance the purchase, Gary used approximately $240,000 from Chvala's personal savings account, and he and Chvala jointly borrowed the balance of the purchase price. Both Gary and Chvala signed the promissory notes and loan agreements.

Rita became the titled owner of a quarter section of the Morrison Land, and Diane took title to the other quarter section through Sandyland, LLC, an entity formed by Chvala expressly for that purpose.

Chvala prepared the deeds, transfer statements, and bills of sale for Gary, Sandyland, and Rita.

### (c) Termination of Prior Leases

After the closings, Chvala drafted lease termination notices on behalf of all of the new owners of the Morrison Land— Gary, Sandyland, and Rita. In the notices, Chvala represented herself as the attorney for each Morrison Land owner. In a subsequent letter dated February 28, 2003, and addressed

- 521 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

collectively to "Diane, Rita, Wayne and Kurt," Chvala provided copies of the lease termination notices she had sent to the former tenants, explaining:

I felt like the owner needed to terminate the lease in order to prevent an argument by a tenant that we as owners could only terminate if the property was sold to another third party. Therefore, I think we are covered in that both Morrisons and us have forwarded notices of termination of the existing lease to the current tenants and sub-tenant.

If you have any questions regarding this matter, please let me know.

Chvala testified that she prepared the termination notices "for all of the parties to ensure that the previous tenants were not going to show up and try to farm this property."

### (d) Lease and Option Agreements on Morrison Land

At the time of closing, the leases and option agreements governing the Morrison Land had not yet been prepared. Wayne testified that he and Kurt were not concerned by the delay because "[w]e trusted that what we talked about [with Chvala] is what was going to happen." Eventually, Chvala prepared all of the lease and option agreements that governed Wayne and Kurt's relationship with the three Morrison Land owners. The agreements were similar, but we focus primarily on the terms of the agreements that governed the half section of the Morrison Land titled in Gary's name.

### (i) Lease Agreement

Chvala prepared a 10-year triple-net lease agreement which Gary signed as the lessor, and Wayne and Kurt signed as the lessees. Paragraph 3 of the lease agreement provided that base rent was "a sum that constitutes a net net net seven percent (7%) annual return on the total cost to LESSOR of the land," which amounted to "an annual rental of $34,835.00 per year." The lease agreement also contained paragraph 21, which provided:

- 522 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

21. REPRESENTATION. The law firm of STROPE, KROTTER & GOTSCHALL, P.C. has prepared this Lease Agreement. The law firm of STROPE, KROTTER & GOTSCHALL, P.C. has in the past and presently performs legal services for both LESSOR and LESSEE in unrelated matters. LESSOR AND LESSEE, by signing this document, hereby acknowledge and agree that STROPE, KROTTER & GOTSCHALL, P.C. is not acting as an attorney for either party to this contract. LESSOR and LESSEE expressly acknowledge and agree that they have had an opportunity to have an attorney of their choosing review this Lease Agreement and freely and voluntarily sign this Agreement without reliance upon any representations or advice from STROPE, KROTTER & GOTSCHALL, P.C. All parties agree that they have not relied on the legal representation or advice of . . . CHVALA in this matter and that they have had an opportunity to have any attorney of their choosing review this Agreement and sign the same voluntarily and without reliance upon any representation or advice from . . . CHVALA.

Despite the representation in paragraph 21 that Chvala "[was] not acting as an attorney for either party to this contract," she admitted during the evidentiary hearing that she was advising Gary in the transaction "as his spouse." None of the other lease agreements on the Morrison Land indicated on whose behalf the agreement was prepared.

### (ii) Option Agreements

Chvala prepared separate option agreements for Wayne and Kurt to sign with all three Morrison Land owners. None of the option agreements indicated whether they were prepared on behalf of the respective Morrison Land owner, or Wayne and Kurt, or both. Again, we focus primarily on the terms of the option agreement involving the half section of the Morrison Land titled in Gary's name.

- 523 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

That option agreement identified Gary as the "seller" and identified Wayne and Kurt as the "purchasers" of the half section of the Morrison Land. It gave Wayne and Kurt an exclusive option to purchase the half section of land for $497,637. They could exercise the option any time after November 1, 2010, until 5 p.m. on March 1, 2013, by providing written notice thereof to Gary either in person or by registered mail at the Atkinson address where Chvala and Gary resided at the time the option agreement was executed. The option agreement contained no disclaimer similar to that in paragraph 21 of the lease agreement.

At the time the option agreement was signed, the assessed value of the Morrison Land was $528 per acre. Ten years later, due to a significant rise in land values, the assessed value was $2,167 per acre, and the market value was significantly higher.

### (e) Modification of Rents

Bill Gaines is a certified public accountant who, at all relevant times, represented Wayne and Kurt and their various businesses, Diane and her businesses, and Chvala and Gary and their businesses. Chvala's files indicate that in July and November 2003, she talked with Gaines about the Morrison Land leases and the impact of the "passive activity rules" governing related parties. After meeting with Gaines in November 2003, Chvala learned that modifying the Morrison Land lease agreements to a modified crop-share arrangement would result in more favorable tax treatment for the landowners.

On November 25, 2003, Chvala sent a letter to Wayne and Kurt on her firm letterhead. The other Morrison Land owners were copied on the letter. Chvala reported that Gaines had suggested "on all of the leases we use a modified crop share arrangement and have you pay a dollar amount for the crops produced on the real estate and then reimburse you for fertilizer, chemicals, seed and machine hire to arrive at the same net." Chvala's letter advised, "This income will still not be subject to social security tax but then would be considered as

- 524 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

active income or loss and not subject to the passive activity rules." Her letter also advised Wayne and Kurt, "Before we go any further, please check with the FSA Office to insure the two of you can still receive all government payments if a crop share arrangement is in place." She added, "If you would rather I contact them, please let me know."

Kurt testified that he understood this change in rents was designed to provide a tax benefit to the owners of the Morrison Land. He and Wayne did not object to the change, because they had "trust and confidence" in Chvala. According to Kurt, because Chvala had asked for the change, they were "willing to do it."

Regarding the rent modification, the referee found:

[Chvala] determined that for income tax purposes it would be advantageous if the Kaups' cash lease was changed to a modified crop share. However, there was no benefit to Wayne and Kurt to make this change if it meant that their annual rental amount could increase. To address that concern, [Chvala] told Wayne and Kurt that even though they would call the arrangement a modified crop share, the annual cash rental amount would not change. All Wayne and Kurt had to do was manipulate the input expense numbers and crop sale numbers to arrive at the same net rental amount.

The record shows that after November 2003, Wayne and Kurt, doing business as K & W Farms, paid rent using the modified crop-share arrangement suggested in Chvala's letter. To facilitate the modified rents, Chvala instructed Wayne and Kurt to complete an annual "[r]ent [w]orksheet," which they did. No written changes or addenda were made to the previously executed lease agreement.

## 2. TRANSFER OF OWNERSHIP TO TTC ENTERPRISES

In December 2003, Chvala and Gary formed TTC Enterprises, LLC, and Gary transferred title of the half section of the Morrison Land to TTC Enterprises. Chvala prepared the legal

- 525 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

documents necessary to both create TTC Enterprises and to effectuate the title transfer of the Morrison Land. Gary owned 99 percent of the shares in TTC Enterprises, and Chvala owned the remaining 1 percent. Chvala notified Wayne and Kurt that ownership of the half section of the Morrison Land had been transferred to TTC Enterprises, but she did not advise them of her ownership interest in the entity.

Throughout the 10-year lease term, Wayne and Kurt farmed the Morrison Land as part of their farming operation, K & W Farms, which Chvala reorganized as a partnership in 2006. Wayne and Kurt delivered to Chvala at her law office rent checks for the half section of the Morrison Land owned by TTC Enterprise. The first year the rent was made payable to Gary, and thereafter, the checks were made payable to TTC Enterprises. When the Kaup brothers received checks from TTC Enterprises regarding the Morrison Land, they were signed by Chvala and made payable to "K & W Farms."

### 3. Premier Pork, LLC, Builds Hog Facility

Premier Pork, LLC, is an entity Chvala created for Wayne and Kurt in 1998. At all relevant times, Chvala was the attorney for Premier Pork. Wayne, Kurt, Diane, and Rita were all members of Premier Pork when it was organized. In late 2004, Wayne and Kurt met with Chvala to discuss plans for Premier Pork to construct a hog finishing facility on nonirrigated portions of the Morrison Land.

Their plan was to construct the facility on a 5-acre triangle of the Morrison Land owned by TTC Enterprises and an adjacent 5-acre triangle of the Morrison Land owned by Rita. Because it was essential to the hog finishing business that manure generated by the hogs could be spread across the entire section of the Morrison Land, Premier Pork also needed to obtain manure easements from all of the owners of the Morrison Land. Wayne testified they would never have proposed building the hog confinement facility on the Morrison Land if there was any question they were not going to "own

- 526 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the land later." He testified that Chvala and Gary were "[v]ery accommodating" of their plan.

Wayne and Kurt asked Chvala to assist them with the land transfers and easements needed to start the hog finishing operation on the Morrison Land. Wayne testified that he and Kurt obtained the necessary measurements of the 5-acre tracts and provided the information to Chvala so she could prepare legal descriptions and warranty deeds conveying the tracts from TTC Enterprises and Rita to Premier Pork. Chvala admitted she communicated with Wayne about these transactions, and she further admitted that Wayne asked her office to prepare the necessary warranty deeds, real estate transfer statements, and manure easements. But Chvala denied preparing the necessary legal documents, testifying instead that her legal assistant prepared the documents under her supervision.

TTC Enterprises transferred the 5 acres from its half section of the Morrison Land to Premier Pork on April 19, 2005. Wayne and Kurt's annual rent on the remaining half section of the Morrison Land owned by TTC Enterprises did not change after the transfer. As part of the TTC Enterprises transaction, Chvala also prepared a "Real Estate Transfer Statement Form 521." This form stated TTC Enterprises was the grantor, and Chvala signed the form as the representative for the grantee, Premier Pork.

After acquiring the 5 acres from both TTC Enterprises and Rita and obtaining manure easements from all owners of the Morrison Land, the Kaup brothers spent nearly $1 million dollars to build the hog finishing facility on the Morrison Land.

### 4. Legal Representation
### of Kaup Brothers

The referee found that throughout the 10-year term of the leases on the Morrison Land, Chvala continued to represent Wayne and Kurt in their personal and business matters. We summarize just a fraction of the evidence of that representation:

- 527 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

• From 2002 to 2009, Chvala provided ongoing representation to K & W Trucking, Inc., an entity owned by Wayne and Kurt and used to haul grain;

• From 2003 to 2011, Chvala provided ongoing representation to Green Valley Hay & Mulch, LLC, a hay brokerage business owned by Wayne;

• From 2004 to 2006, Chvala provided ongoing representation to Wayne and Kurt regarding their various business and farming operations, including K & W Farms;

• From 2006 through 2011, Chvala provided ongoing representation to K & W Farms after it was reorganized as a partnership;

• From 2004 through 2007, Chvala provided ongoing representation to Premier Pork, the hog finishing business owned by Wayne and Kurt and others;

• From 2004 through 2009, Chvala provided estate planning services to Wayne;

• In 2005 and 2006, Chvala provided estate planning services to Kurt; and

• In 2007, Chvala and her law partner represented Wayne in his divorce.

Moreover, during the 10-year term of the Morrison Land leases, Chvala regularly communicated with Wayne and Kurt regarding a variety of legal matters, including some relating to the Morrison Land. For instance, in October 2004, Chvala met with Wayne and Kurt to discuss and coordinate their various land, farming, and livestock matters. Chvala's notes from that meeting show they discussed the Morrison Land, including the Kaup brothers' plan to construct the hog finishing facility on that land. In July 2006, Chvala met again with Wayne and Kurt to discuss their business planning needs, and Chvala's notes from that meeting included reference to K & W Farms' farming operation on the Morrison Land and Premier Pork's new hog finishing facility on the Morrison Land.

- 528 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

### 5. February 23, 2010, Meeting

On February 23, 2010, Wayne and Kurt met with Chvala and discussed at least three matters: certain buy-sell arrangements involving their businesses, the operating structure of their businesses, and the option to purchase the half section of the Morrison Land owned by TTC Enterprises. With respect to the option to purchase, Chvala's notes from that meeting say "R/E / Lease - documents control, their option - OK to continue lease."

Chvala kept a personal file titled "Chvala/Kaup Option and Lease," and during the evidentiary hearing, she offered a memorandum to that file dated February 25, 2010, which she prepared concerning the February 23 meeting. This memorandum stated in part:

> We discussed the Lease Agreement and Purchase Option that Gary/TTC have with Wayne and Kurt. I told them that Gary had no problem continuing the lease arrangement for the time being. We also discussed the fact that I do their work on other legal matters and we have differing interests on this matter and that I cannot represent them on this issue, as I will be protecting Gary and my interests, and they should feel free to obtain separate, other representation on this arrangement. They said they understood that and then asked if we intended to honor the agreements and I responded "certainly, they are legally binding documents, we made the deal and we intend to follow the terms of the agreements."

Wayne testified that the statements described by Chvala in this memorandum never happened. Specifically, he testified Chvala "[n]ever" discussed that her interest in the lease and option agreements differed from theirs and "[n]ever" told them to consult other legal counsel regarding the Morrison Land. According to Wayne, when they discussed the option agreement during the February 23, 2010, meeting, the focus was on whether Chvala and Gary were interested in selling at least a portion of the half section of the Morrison Land owned by

- 529 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

TTC Enterprises early, before the option opened. Wayne testified that Chvala told them they were not interested in splitting the land, but did want to find other land to invest in when the time came to exercise the option. The referee's report indicates he found Wayne's testimony on this issue more credible than Chvala's.

### 6. April 15, 2011, Letter

In January 2011, during a time when the option period was open, Kurt contacted Chvala's office and asked for signed copies of the agreements he and Wayne had with the Morrison Land owners. Approximately 3 months later, on April 15, Chvala responded to this request in a letter to Kurt, enclosing a copy of the option agreement between Gary and the Kaup brothers. Her letter advised that she checked her files but could not find signed copies of the option agreements with either Rita or Sandyland. The April 15 letter also stated:

> As you know, I perform various legal work for you and your entities as needed or directed by you. We have previously discussed the Lease Agreement and Purchase Option and I have informed you that we have differing interests and I cannot represent you on those matters, and you should feel free to obtain separate, other representation on that arrangement. It is our intention to continue the lease arrangement this year as in the past.
>
> If you wish to discuss further, please feel free to contact me.

### 7. November 12, 2012, Telephone Call

On November 12, 2012, Kurt telephoned Chvala at her office. He knew the option was open at this time, and he testified that he called to "relay[] to her again that we were wanting to buy their ground." During the call, Kurt told Chvala they were "ready and willing" to purchase the half section of the Morrison Land. He testified that Chvala responded by saying that she was busy, that she and Gary were looking for other land to invest in, and that she was looking "to do something

- 530 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

more towards the end of the year." Kurt testified Chvala did not tell him they needed to do anything else to exercise the option, and after the November 12 telephone conversation, Kurt expected they would be able to purchase the half section of the Morrison Land from TTC Enterprises at the end of 2012. When asked whether he relied on that telephone conversation with Chvala, Kurt testified, "Very much so." He also testified that because he always dealt with Chvala with respect to the Morrison Land, he never even thought about communicating directly with Gary.

Chvala agreed that Kurt telephoned her office on November 12, 2012, but she testified it was to discuss settling up the modified rent amounts for that year. She admitted that during the call Kurt mentioned they were working on financing for the option, but she denied that Kurt said, "I want to exercise the option." She also denied telling Kurt that she and Gary were looking for other investment property. The day after this telephone call, Wayne and Kurt wrote a check to TTC Enterprises for the 10th and final annual rent payment due under the lease agreement. The referee found that, at this point, Chvala and Gary had "received the 7% annual return on their investment as agreed to in January 2003."

Kurt subsequently learned of some land for sale known as the Waldo Quarters. On or about December 12, 2012, Kurt called Chvala to inform her the Waldo Quarters land was available. Chvala responded in a text message to Kurt the same day: "Not interested in Waldo Qtrs . . . probably nothing this year . . . ."

### 8. Communication With Bank
### and Title Company

On or about December 13, 2012, 1 day after Chvala told Kurt she was not interested in buying the Waldo Quarters, Kurt contacted Jon Schmaderer, president of the local bank, to arrange financing to purchase the half section of the Morrison Land owned by TTC Enterprises. Kurt told Schmaderer the deal would be done by the end of the year. That same day,

- 531 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Schmaderer asked bank employee Nicole Cadwallader to "order a $500,000 title commitment on K&W Farms" and provided a legal description of the half section of the Morrison Land owned by TTC Enterprises. Schmaderer told Cadwallader he thought Chvala would do the closing. Cadwallader replied that she would contact the title company to find out the relevant information.

Cadwallader did so on December 18, 2012, and the title company told her it needed the seller's name, sale price, and the legal description of the property or a copy of the purchase agreement to order the title insurance. During this conversation, Cadwallader told the title company that Chvala was handling the closing.

On December 19, 2012, the owner of the title company called Chvala and left a message with her secretary asking Chvala to call him "ASAP." Chvala knew the owner and had done business with him in the past. The secretary told Chvala that the owner of the title company had received "a note from [Cadwallader] . . . something about K&W Farms. He doesn't have any info to go on. [Cadwallader] said you were handling!" Chvala testified that she read the message, but did not understand it to be referencing the purchase option with Wayne and Kurt. She did not respond to the message.

## 9. December 19, 2012, Telephone Call

Also on December 19, 2012, Cadwallader telephoned Chvala to discuss the information she needed to order the title insurance. Cadwallader testified that the conversation lasted 1 minute or less and that she "asked if [Chvala] was handling the [K & W Farms] closing." According to Cadwallader, Chvala seemed to recognize what she was talking about and did not seem confused. Chvala told Cadwallader the closing was not going to happen before the end of the year, but was "'[l]ooking more towards March.'"

Chvala recalled Cadwallader asking whether she had a purchase agreement and saying Wayne and Kurt needed to close by the end of the year. But according to Chvala, she did

- 532 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

not realize Cadwallader was referencing the Morrison Land and instead thought she was referring to the Waldo Quarters, which Chvala understood Wayne and Kurt were interested in buying.

### 10. Title Commitment Email

After the telephone call with Chvala on December 19, 2012, Cadwallader sent an email to the bank stating:

> I just talked to [Chvala] and the deal between her and K&W is not happening this year. She said she cannot get it done and is looking more toward March for a closing date. I have talked to [the loan officer] and he was going to let Kurt know. McCarthy is working on the title insurance and will have that to us but no closing for now.

A title commitment was sent via email from the title company to both Cadwallader and Chvala on December 21. The title commitment clearly showed the land to be purchased by Wayne and Kurt was the half section of the Morrison Land owned by TTC Enterprises. Chvala testified she did not open this email until sometime in January 2013. Once she opened the email and saw the title commitment, she admits she knew Wayne and Kurt were trying to move forward with closing on the half section of the Morrison Land owned by TTC Enterprises. Despite this knowledge, Chvala did nothing. Instead, she waited until after the option period closed to contact Wayne and Kurt. When asked why, Chvala testified, "I thought having communication with them would have been a violation of the ethical rules. I distanced, advised I could not represent them, and I did not want to give them any communication or advice at all."

Wayne testified that he and Kurt both knew Chvala was aware they wanted to buy the half section of the Morrison Land, so when the closing did not occur at the end of 2012 they simply "trusted it was going to happen" based on "how [Chvala's] schedule" worked. Wayne was not concerned when the option period closed on March 1, 2013, because he had "an immense amount of trust" in Chvala.

- 533 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

## 11. March 2013 Communications

By its terms, the option terminated at 5 p.m. on March 1, 2013. Kurt called Chvala's office on March 6, but Chvala did not take his call, even though she was in the office. On March 8, Kurt sent an email to Chvala which stated:

> I know I have talked to you about our intent to purchase the S ½ of Section 6-31-14 a couple of times back in the spring of 2011 and again in December of 2012. . . . Schmaderer told me he was going to order the Title Commitment back in December. I believe that has been delivered to the bank and they are just waiting for a Purchase Agreement. I was wondering if we could get together with you hopefully this week and get this finished up or if that won't work at least get something done here in the month of March.

The same day this email was received by Chvala, it was faxed by Gary to an attorney he had retained to represent him in the matter. Gary's attorney then sent Wayne and Kurt a letter by certified mail advising that the purchase option and lease had expired, but that Gary was willing to enter into a new lease agreement with them. After receiving this certified letter, Kurt telephoned Gary because he was "confused about why we were getting [the letter] after everything I had been doing towards the end . . . of 2012." According to Kurt, Gary told him, "'That's [Chvala's] deal.' . . . 'You'll have to talk to her about that.'"

On March 12, 2013, Chvala wrote a letter to Wayne and Kurt. She acknowledged they had been attempting to reach her for several days, and then stated:

> Years ago, when the leases were drafted, I handled those matters and included disclosure and obtained your consents to my doing so.
>
> Now, I think changes in the law make it prudent that I refrain from providing services to you in connection with new contracts or legal matters with my husband or our company. I prefer not to continue to provide service even with consents and waivers of possible conflicts.

- 534 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

In response, Wayne and Kurt hired another attorney who, on March 15, 2013, sent Gary a letter via registered mail to the address listed in the option agreement, notifying him that Wayne and Kurt were exercising their option to purchase the half section of the Morrison Land. Gary's attorney rejected this as a "nonconforming attempt to exercise the option at issue." On April 2, Wayne and Kurt tendered a cashier's check for the option purchase price to Gary and TTC Enterprises. This too was rejected.

### 12. Civil Suit and Settlement

On April 8, 2013, Wayne and Kurt filed a civil lawsuit in the district court for Holt County against Gary, Chvala, and TTC Enterprises. Gary died unexpectedly in July, and the civil suit was revived with Chvala as Gary's personal representative. The parties eventually settled the civil suit, and as a result of the settlement, Wayne and Kurt purchased the half section of the Morrison Land owned by TTC Enterprises for $1.8 million— more than 3½ times the purchase price of $497,637 set out in the option agreement.

### 13. Procedural History of Disciplinary Action

While the civil lawsuit was pending, Chvala contacted the Counsel for Discipline to self-report that there had been "some suggestion" her actions with respect to the Morrison Land may have violated the disciplinary rules. Wayne and Kurt subsequently filed a grievance against Chvala with the Counsel for Discipline, also regarding the Morrison Land. The Committee on Inquiry of the Third Judicial District reviewed the matter and determined there were reasonable grounds for discipline against Chvala. Formal charges were filed on July 26, 2017, and amended formal charges were filed on January 29, 2018.

Prior to September 1, 2005, the conduct of Nebraska attorneys was governed by Nebraska's Code of Professional

- 535 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Responsibility. Since that date, the conduct of Nebraska attorneys has been governed by the Nebraska Rules of Professional Conduct. Because the alleged disciplinary violations against Chvala span from 2003 through 2013, Chvala was charged with violations of various provisions under both the code and the rules. Some of the sections of the Nebraska Rules of Professional Conduct have been amended after 2013, but for purposes of this opinion, the current version of the rules will be referenced, because the amendments do not impact the applicability of the rules to Chvala's alleged disciplinary violations. Chvala denied all charges.

Retired Judge Paul W. Korslund was appointed as referee, and a 4-day evidentiary hearing was held. The referee issued a 99-page report and recommendation finding multiple violations of the disciplinary provisions and recommending Chvala be disbarred. Chvala timely filed exceptions to the referee's report and recommendation.

## III. STANDARD OF REVIEW

[1,2] Attorney discipline cases are original proceedings before the Nebraska Supreme Court. As such, the court reviews a referee's recommendations de novo on the record, reaching a conclusion independent of the referee's findings.[1] Violations of disciplinary rules must be established by clear and convincing evidence.[2]

## IV. ANALYSIS

[3-5] The basic issues in a disciplinary proceeding against an attorney are whether discipline should be imposed and, if so, the appropriate discipline evaluated under the particular facts and circumstances of the case.[3] In this appeal, Chvala

---

[1] See *State ex rel. Counsel for Dis. v. Nimmer*, 300 Neb. 906, 916 N.W.2d 732 (2018).

[2] See *id.*

[3] *State ex rel. Counsel for Dis. v. Jorgenson*, 302 Neb. 188, 922 N.W.2d 753 (2019).

- 536 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

contends the referee erred in finding she committed any violation of a disciplinary provision and further erred in recommending disbarment. Where, as here, a party takes exception to the referee's report, this court conducts a trial de novo on the record in which we reach a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another.[4] Here, the referee made express determinations regarding the relative credibility of the testimony of Chvala and Wayne and Kurt on certain matters. When a referee makes an express determination about the relative credibility of witnesses, we give weight to that determination in our de novo review, but we are not bound by it.[5]

We have conducted a trial de novo on the record, and we address below those disciplinary violations alleged in the amended formal charges which we find were proved by clear and convincing evidence.

## 1. PRELIMINARY ISSUES

In defending against these disciplinary charges, Chvala emphatically denies that she (1) played any role whatsoever in the Morrison Land deal or (2) provided any legal representation regarding the Morrison Land. We soundly reject both arguments. Instead, we find clear and convincing evidence that Chvala played a central role in negotiating the purchase of the half section of the Morrison Land, that Chvala was an owner of that land, and that Chvala provided simultaneous legal advice and representation to both the lessors and the lessees of the Morrison Land.

---

[4] *Nimmer, supra* note 1.

[5] See *State ex rel. Counsel for Dis. v. Ellis*, 283 Neb. 329, 808 N.W.2d 634 (2012).

- 537 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

### (a) Chvala Negotiated Morrison Land Deal

Chvala flatly denies any direct involvement in the January 12, 2003, meeting with the Kaup brothers. She claims the decision to purchase the Morrison Land, and all the decisions regarding that investment, were made by Gary. In arguing that no disciplinary provisions are implicated by her conduct, Chvala's brief to this court states, "[She] did not buy the Morrison Ventures land or lease it to Kaups; her husband did. So the [disciplinary] Rule does not apply."[6]

The referee expressly found that, to the extent Chvala testified she was not involved in either the January 12, 2003, meeting or in decisions regarding how to structure the Morrison Land investment, her testimony was "implausible and not credible." Having reviewed the record de novo, we agree.

There is clear and convincing evidence that once Wayne and Kurt approached Chvala about investing in the Morrison Land, she became the primary negotiator of the resulting deal. The record fully supports the referee's findings that (1) Chvala was the one who decided to purchase a half section of the Morrison Land and lease it back with an option to purchase rather than loan Wayne and Kurt money to purchase a quarter section of the land outright, (2) Chvala was the one who negotiated the terms of the lease agreement with Wayne and Kurt, and (3) Chvala was the one who decided the half section of the Morrison Land would be titled in Gary's name for estate planning purposes.

### (b) Chvala Was Investor and Owner

The record also refutes Chvala's claim that she had no ownership interest in the Morrison Land. It is true that the half section of the Morrison Land was initially titled in only Gary's name, but roughly half the funds used to purchase the land came from Chvala's personal bank account and she was obligated on the promissory note that secured the remaining portion of the

---

[6] Brief for respondent at 30.

- 538 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

purchase funds. She therefore had a personal financial interest as an investor in the half section of the Morrison Land from the date of purchase forward. Moreover, Chvala obtained an ownership interest in the Morrison Land once Gary transferred title of his half section to TTC Enterprises, an entity in which Chvala was a shareholder. On this record, we find Chvala was as much an investor and owner in the half section of the Morrison Land as was her husband, and we soundly reject her claims to the contrary.

### (c) Chvala Acted as Attorney
### Regarding Morrison Land

Chvala generally denies acting as an attorney regarding the Morrison Land. She specifically denies either (1) preparing the legal documents related to the Morrison Land transactions or (2) representing any client in matters relating to the Morrison Land. We address each argument in turn, and we reject both.

### (i) Chvala Prepared All Relevant
### Legal Documents

Throughout her testimony, Chvala resisted being characterized as the attorney who prepared the legal documents relating to the Morrison Land. The following exchange is one such example from her testimony:

> [Counsel for Discipline:] [Y]ou participated in the transfer of approximately 4.7 acres of land from TTC Enterprises to Premier Pork in April of 2005; correct?
>
> [Chvala:] No.
>
> Q: No. You didn't participate in that?
>
> A: No.
>
> Q: You didn't draft any of the documents?
>
> A: My office did.
>
> Q: Who in your office?
>
> A: Barb.
>
> Q: Is she a lawyer?
>
> A: No.

- 539 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Q: No. Did Barb on her own create these documents?

A: Yes.

Q: Without any input from you? Is that what you're testifying?

A: I prepared the deed forms. I had the deed forms in my office available. I oversee my staff. When this transaction came up, I communicated with Wayne. He said what he wanted. He wanted a deed from Gary and an easement.

Q: Okay. And you prepared those in your office?

A: No. I told him to deliver the documents, and I would get them to Gary.

Q: Deliver what documents?

A: The deed and the easement.

Q: Who prepared those?

A: He didn't have time to go have them done somewhere else, so asked Barb to prepare those documents.

Q: Who asked Barb?

A: Wayne.

Q: Wayne came to your office and asked Barb to prepare documents regarding a transaction with TTC Enterprises?

A: Yes. And said that his mother[, Diane,] would be sending the legal descriptions.

Q: And so Barb was providing legal representation to Wayne . . . ?

A: No. Our office was the scrivener on those deeds with the legal description that Diane with Wayne provided by fax to Barb.

Consistent with the above testimony, Chvala generally took the position that the legal documents pertaining to the Morrison Land, including warranty deeds in 2003 and 2005, the lease agreements, the option agreements, and the manure easements, were all prepared by nonattorney staff in her office using standard forms she had prepared previously. In her testimony, Chvala repeatedly described her role in preparing those legal

- 540 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

documents as that of a "scrivener." In her brief to this court, she repeats this general argument, urging us to find that when a lawyer acts as a "scrivener" they are not acting as an attorney for any party.[7] We firmly reject her invitation.

[6] Even assuming without deciding that an attorney may, consistent with the ethical rules, enter into a limited scope agreement[8] for the sole purpose of reducing to writing an agreement separately negotiated by parties with differing interests, there was no limited scope agreement here with respect to any of the Morrison Land documents Chvala prepared. Chvala's argument that she should be treated only as a scrivener appears to be an attempt to minimize the role she played as an attorney by suggesting she had no meaningful role in preparing essential legal documents that related to the Morrison Land. But it hardly needs saying that a lawyer is ultimately responsible for the conduct of his or her employees and associates in the course of the professional representation of the client.[9]

Only lawyers may engage in the practice of law in Nebraska, and that includes "[s]election, drafting, or completion, for another entity or person, of legal documents which affect the legal rights of the entity or person."[10] Nonlawyer assistants in a law office act under the supervision of a lawyer,[11] and they "act for the lawyer in rendition of the lawyer's professional services."[12] A lawyer may not avoid responsibility for misconduct by hiding behind an employee's behavior, nor may the lawyer avoid a charge of unprofessional conduct by contending the legal work was performed by an employee.[13] And as

---

[7] *Id*. at 21.

[8] See Neb. Ct. R. of Prof. Cond. § 3-501.2 (rev. 2016).

[9] *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989).

[10] Neb. Ct. R. § 3-1001(B).

[11] Neb. Ct. R. § 3-1005.

[12] Neb. Ct. R. of Prof. Cond. § 3-505.3, comment 1.

[13] See *Kirshen, supra* note 9.

- 541 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

previously stated, a lawyer is ultimately responsible for the conduct of his or her employees and associates in representing clients.[14]

It is thus immaterial, for purposes of this disciplinary action, whether Chvala personally prepared the legal documents relating to the Morrison Land or had her office staff prepare them for her review and approval. The evidence is clear and convincing that Chvala was the attorney responsible for preparing most, if not all, of the essential legal documents related to the Morrison Land. We reject, as both factually and legally unsound, Chvala's attempts to distance herself from the preparation of the essential legal documents in an effort to avoid the disciplinary provisions governing attorneys.

### (ii) Chvala Represented Lessors and Lessees of Morrison Land

Despite preparing all of the pertinent legal documents relating to the Morrison Land, Chvala denies representing any of the Morrison Land lessors (Gary, TTC Enterprises, Sandyland, and Rita) or lessees (Wayne and Kurt) in any matter related to the Morrison Land. Chvala does not deny that during the term of the Morrison Land lease agreements all these parties were her existing clients in other matters, but she argues that she did not represent any of these parties in matters related to the Morrison Land. We find her position in this regard somewhat astonishing.

[7] Although Chvala did not have a discreet engagement agreement with any of the lessors or lessees with respect to the Morrison Land, that does not end our inquiry. An attorney-client relationship with respect to a particular matter may be implied from the conduct of the parties.[15] And here, we find clear and convincing evidence, particularly when viewed from the standpoint of the lessors and lessees of the Morrison Land,

---

[14] See *id.*

[15] See *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 466 N.W.2d 499 (1991).

- 542 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the conduct of the parties shows that Chvala was the attorney everyone looked to for legal advice related to the Morrison Land and that she was the attorney who prepared all of the legal documents necessary to achieve their goals and protect their interests regarding that land.

[8] Generally speaking, an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.[16] In appropriate cases the third element of an attorney-client relationship may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it.[17]

Here, the record shows that from January 12, 2003, until at least March 12, 2013, all those involved with the Morrison Land, including the Kaup brothers, sought and relied upon Chvala's assistance in transactions related to the Morrison Land. Sometimes Chvala's assistance was specifically requested on a Morrison Land matter—like when she was asked to form Sandyland for Diane to hold and manage the Morrison Land, when she was asked to prepare the warranty deeds and transfer statements on behalf of all three Morrison Land purchasers, and when she was asked by Wayne to prepare the warranty deeds so Premier Pork could obtain title to portions of the Morrison Land from TTC Enterprises and Rita. But in most instances, Chvala provided legal advice and assistance regarding the Morrison Land without a specific request. It appears she did so on her own initiative, performing the legal work she felt was necessary.

For instance, shortly after closing on the Morrison Land occurred, Chvala prepared and sent lease terminations to all of

---

[16] *Id.*

[17] *Id.*

- 543 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the prior tenants, representing herself as the attorney for each of the three Morrison Land owners. There is no evidence the Kaup brothers or any of the three landowners asked Chvala to take this action on their behalf, but Chvala admits that she prepared and sent the lease terminations on behalf of "all the parties" and that she did so "to ensure that the previous tenants were not going to show up and try to farm" any of the Morrison Land. Chvala forwarded copies of the lease termination notices in a letter she collectively addressed to "Diane, Rita, Wayne and Kurt" explaining to all that she felt the notices were necessary to protect against an argument by the prior tenants and subtenants that they still had rights to farm the Morrison Land. Chvala's actions in this regard would reasonably lead Diane, Rita, Wayne, and Kurt to believe she was protecting and representing their collective interests in the matter, and Chvala did nothing to negate that belief.

Chvala prepared all of the lease agreements and all of the option agreements that governed the relationships between the owners of the Morrison Land as lessors and Wayne and Kurt as lessees. In the lease agreement between Gary and the Kaup brothers, Chvala included language stating that she was "not acting as an attorney for either party to this contract." But no such language appears in any of the other lease agreements, or in any of the three option agreements. Instead, it is not apparent from the face of those agreements, or from the testimony of the parties, whether Chvala prepared those agreements on behalf of the lessors, the lessees, or both. What is apparent is that even absent evidence that a particular client directed Chvala to prepare the lease and option agreements on their behalf, the agreements were necessary to accomplish the investment goals and to protect the financial interests of all those involved in the Morrison Land transactions, whether as lessors or lessees. We therefore conclude that, on this record, with the exception of the lease agreement Chvala prepared for Gary and the Kaup brothers, her conduct in preparing all the necessary lease and option agreements for all involved parties would reasonably lead those parties to believe Chvala was

- 544 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

protecting and representing their interests in the matter. Chvala did nothing to negate that belief.

In November 2003, Chvala sent a letter to Wayne and Kurt on her firm letterhead, with copies to all Morrison Land owners, reporting that Gaines, their mutual accountant, had suggested "all of the leases" should use a modified crop-share arrangement rather than a triple-net arrangement. There is no evidence that any lessor or lessee specifically asked Chvala to modify the rental arrangement, but Chvala presented the arrangement as benefiting all of the Morrison Land owners, and the record shows that after Chvala sent the letter, Wayne and Kurt began paying rent under the modified arrangement. In the same letter, Chvala offered to contact the "FSA Office" on behalf of Wayne and Kurt to ensure they would still be able to receive government payments if a modified crop-share arrangement was in place. This is yet another example that would lead the parties, whether they be lessors or lessees, to believe Chvala was representing their collective interests regarding the Morrison Land.

We further note that even Chvala's own words support a finding that she considered herself to have an attorney-client relationship with Wayne and Kurt on matters related to the Morrison Land. In the letter she sent them on March 13, 2013, she stated that in the future she would "refrain from providing services" to them "in connection with new contracts or legal matters with my husband or our company." We read this as an implied admission that she had been providing legal services to Wayne and Kurt in connection with Gary and TTC Enterprises, and thus the Morrison Land, and the record bears that out.

The evidence demonstrates that all those involved with the Morrison Land, whether as lessors or lessees, were existing clients of Chvala's in other matters and the legal issues involved in the Morrison Land transactions were within Chvala's professional competence and were similar to legal services Chvala had provided previously to these same clients. Everyone involved with the Morrison Land relied on Chvala

- 545 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

to prepare the legal documents that established and governed all their legal interests regarding the Morrison Land. And everyone involved with the Morrison Land reasonably relied on Chvala's legal advice and expertise to protect their interests and accomplish their goals.

Given the collective approach Chvala took to handling all of the legal matters that arose in connection with the Morrison Land—whether asked to or not—and the reasonable expectations that conduct created in her existing clients, it should come as no surprise that we find Chvala represented, either expressly or impliedly, all of the individuals and entities involved in the transactions related to the Morrison Land.

### (iii) Disclaimers of Attorney-Client Relationship

In reaching this conclusion, we do not ignore Chvala's testimony that she orally advised Wayne and Kurt, first during the meeting of January 12, 2003, and later during a meeting on February 23, 2010, that even though she was their lawyer in other legal matters, she could not represent them in matters related to the Morrison Land because Gary was involved. Nor do we ignore evidence of the disclaimer contained in paragraph 21 of the lease agreement between Gary and the Kaup brothers or the letter Chvala sent the Kaup brothers in April 2011 referencing prior oral disclaimers. But as we explain below, none of this evidence changes our conclusion that Chvala had an attorney-client relationship with Wayne and Kurt on matters related to the Morrison Land.

As for any oral disclaimers of an attorney-client relationship regarding the Morrison Land, we have already discussed the referee's credibility finding that Chvala made no such disclaimers. Given that finding, Chvala's April 2011 letter purporting to reference back to earlier oral disclaimers can fare no better. But even if we were to find Chvala's testimony credible, and conclude she expressly told Wayne and Kurt as early as 2003 that she would not represent them in matters related to the Morrison Land, we would nevertheless find that

- 546 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Chvala's subsequent conduct in actually representing the Kaup brothers concerning the Morrison Land speaks louder than her words.

Despite Chvala's claim that she would be representing only Gary's interests with respect to the Morrison Land, Chvala consistently prepared legal documents for, and offered legal advice to, all those involved with the Morrison Land, including Wayne and Kurt. When Chvala met periodically with Wayne and Kurt to discuss their various business ventures and do business planning, the Morrison Land, including the option, was discussed to the extent it impacted K & W Farms and Premier Pork. When Wayne asked Chvala to prepare the necessary documents so Premier Pork could obtain title to portions of the Morrison Land from TTC Enterprises and Rita, she did so, and identified herself as the attorney for Premier Pork in the transaction. When Wayne asked Chvala to prepare manure easements so Premier Pork could spread manure across the entire section of the Morrison Land, she did so. Given Chvala's conduct in actually providing legal advice and representation to Wayne and Kurt in the Morrison Land matter, we cannot give more weight to an oral disclaimer than we do to Chvala's subsequent actions.

We reach a similar conclusion regarding the limited disclaimer language contained in paragraph 21 of the lease agreement. That language purported to disclaim any attorney-client relationship between Chvala and all parties to the lease agreement for purposes of reviewing and signing the lease agreement. But "[e]ven the use of a disclaimer may not prevent the formation of attorney-client relationships if the parties' subsequent conduct is inconsistent with the disclaimer."[18] And here, because there was clear and convincing evidence that Chvala's subsequent conduct was sufficiently inconsistent with the limited disclaimer set forth in paragraph 21 of the lease agreement, Chvala cannot rely on the disclaimer to argue she had no

---

[18] See S.C. Bar Ethics Adv. Comm. 12-03, 2012 WL 1142185 at *4 (Jan. 1, 2012).

- 547 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

attorney-client relationship with the Kaup brothers regarding the Morrison Land.

We now consider the various disciplinary charges against Chvala, and we do so in light of our preliminary findings that she (1) played a central role in negotiating the purchase of a half section of the Morrison Land, and had an ownership interest in that half section of land, and (2) provided legal advice and representation to both the lessors and lessees of the Morrison Land on matters related to the Morrison Land.

## 2. Business Transactions With Clients

Chvala was charged with violating the rules prohibiting lawyers from entering into business transactions with clients under Canon 5, DR 5-104(A), of the Code of Professional Responsibility, which governed her conduct before September 1, 2005, and Neb. Ct. R. of Prof. Cond. § 3-501.8 (rev. 2016), which governed her conduct after September 1, 2005.

DR 5-104 is entitled "Limiting Business Relations with a Client," and provides:

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his or her professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

Section 3-501.8 is entitled "Conflict of interest; current clients: specific rules," and provides in part:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek

- 548 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

(b) A lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.

Before directly addressing the application of either disciplinary provision, we examine two threshold questions that arise under both: (1) whether the Morrison Land deal was a "business transaction" and (2) whether Wayne and Kurt were Chvala's clients at the time she entered into the Morrison Land deal.

### (a) Business Transaction

[9,10] Generally speaking, any "'commercial activity engaged in for a profit'" will constitute a business transaction for purposes of the disciplinary provisions that prohibit an attorney from entering into a business transaction with a client.[19] A "business transaction" is a broad term, and it plainly includes an agreement to purchase real property and an agreement to lease real property.[20]

---

[19] See *Sup. Ct. Bd. of Prof'l Ethics v. Fay*, 619 N.W.2d 321, 325 (Iowa 2000).

[20] See, e.g., *Id.* (arrangement where client leased premises owned by attorney's daughter, in which attorney held life estate, was business transaction with client); *In re Baer*, 298 Or. 29, 688 P.2d 1324 (1984) (real estate purchase agreement between attorney's wife and his clients was business transaction where purchase price was reduced in exchange for attorney's services); *Matter of James*, 452 A.2d 163 (D.C. App. 1982) (real estate purchase agreement between attorney and clients was business transaction).

- 549 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

It is beyond dispute that the Morrison Land purchase, the lease and option agreements, and the various related transactions were all business transactions within the meaning of DR 5-104(A) and § 3-501.8.

### (b) Clients

We have already determined that Chvala actually represented Wayne and Kurt and Premier Pork with respect to the Morrison Land, but it is important to point out that, for purposes of DR 5-104(A) and § 3-501.8, the term "client" has an even broader meaning.

[11] In the context of the disciplinary provisions governing business transactions with clients, a client is defined as one over whom the attorney has influence arising from a previous or current attorney-client relationship.[21] Thus, a "client" in this context means not only one with whom the attorney has an existing attorney-client relationship, but also those who have relied on the attorney on "'an occasional and on-going basis.'"[22] In other words, an attorney need not have an open active case with a client in order to be subject to the restrictions of DR 5-104(A) and § 3-501.8, because otherwise "'the attorney would be free to use the rapport and confidence . . . developed with [the] client to persuade the . . . client to do things that would otherwise be prohibited by [the rules].'"[23] As the Supreme Court of Arizona has explained:

> [I]n attorney-client business ventures, an attorney is deemed to be dealing with a client when "it may fairly be said that because of other transactions an ordinary person would look to the lawyer as a protector rather than as an adversary." . . . We recognize[] that in applying

---

[21] *Bd. of Prof. Ethics and Cond. v. Sikma*, 533 N.W.2d 532 (Iowa 1995). See, also, *Matter of Discipline of Martin*, 506 N.W.2d 101 (S.D. 1993); *Matter of Neville*, 147 Ariz. 106, 708 P.2d 1297 (1985); *Matter of Nichols*, 95 N.J. 126, 469 A.2d 494 (1984).

[22] See *Fay, supra* note 19, 619 N.W.2d at 325.

[23] *In re Schenck*, 345 Or. 350, 363, 194 P.3d 804, 812 (2008).

- 550 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the disciplinary rules we define[] "client" in very broad terms, but we conclude[] that our obligation to police the profession and protect the public interest permit[s] no less.[24]

We agree with this reasoning and emphasize that it applies whether one is defining a "client" for purposes of DR 5-104(A) or its successor, § 3-501.8.

Here, the record shows that when the purchase of and lease of the half section of the Morrison Land was negotiated in January 2003, Chvala had already established an ongoing attorney-client relationship with Wayne and Kurt. She had regularly been advising them on legal matters, including land and business transactions, for approximately 7 years, and it is clear from their conduct that the Kaup brothers viewed Chvala as a protector rather than an adversary.

We thus conclude that, at the inception of the Morrison Land deal in January 2003, Wayne and Kurt were Chvala's clients for purposes of both DR 5-104(A) and its successor, § 3-501.8.

### (c) DR 5-104(A)

The disciplinary rules governing business transactions with clients are designed to address the concern that an attorney's legal skill and training, together with the relationship of trust and confidence between lawyer and client, may create the possibility of overreaching when the lawyer participates in a business transaction with a client.[25] Stated differently, the concern is that "the lawyer may be tempted to subordinate the interests of the client to the lawyer's own anticipated pecuniary gain."[26]

[12] To establish a violation of DR 5-104(A), it is necessary to show that (1) the attorney and the client had differing interests in the transaction, (2) the client expected the lawyer to exercise his or her professional judgment for the protection

---

[24] *Matter of Pappas*, 159 Ariz. 516, 522, 768 P.2d 1161, 1167 (1988).

[25] See § 3-501.8, comment 1.

[26] Canon 5, EC 5-4, of the Code of Professional Responsibility.

- 551 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

of the client, and (3) the client consented to the transaction without full disclosure.[27]

### (i) Differing Interests

[13-15] Differing interests are interests that are conflicting, inconsistent, diverse, or otherwise discordant.[28] Historically, in the disciplinary context, the term "'differing interests'" has been broadly defined to include any interest adversely affecting either the lawyer's judgment on behalf of a client or the lawyer's loyalty to a client.[29] In this respect, it is fundamental that the interests of a purchaser in a transaction are directly contradictory to the interests of the seller in the transaction.[30] Similarly, the competing interests of lessor and lessee necessarily present differing interests under DR 5-104(A).[31]

Regarding the Morrison Land, Chvala's interests clearly differed from the Kaup brothers' interests. Because Chvala and Gary purchased the Morrison Land as an investment, Chvala's financial interest in the property, like Gary's, was that of an owner and lessor. Because Wayne and Kurt's interest in the Morrison Land was that of lessees with an exclusive option to purchase the land at the end of the lease term, Chvala's interests directly conflicted with the interests of Wayne and Kurt.

### (ii) Professional Judgment Expected

[16,17] The nature of the transaction itself can show that the client expected the lawyer to exercise professional judgment for his or her protection.[32] So, too, can the prior relationship of the attorney and the client.[33] As a general matter, "'it is natural

---

[27] *State ex rel. NSBA v. Thor*, 237 Neb. 734, 467 N.W.2d 666 (1991).

[28] *Id.*, citing Canon 5, EC 5-14, of the Code of Professional Responsibility.

[29] David J. Beck, Transactions with Clients, 43 Baylor L. Rev. 149, 152 (1991).

[30] See *Fay, supra* note 19.

[31] See *id.*

[32] See *id.* See, also, *Thor, supra* note 27.

[33] *Matter of Pappas, supra* note 24.

- 552 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

and proper for a client with a longstanding business relationship with a lawyer to feel that the lawyer is to be trusted, will not act unfairly, and will protect him against danger.'"[34]

Here, Wayne and Kurt had been Chvala's clients for approximately 7 years at the time the Morrison Land deal was entered into, and the record shows they trusted and respected her. The record also shows Wayne and Kurt expected Chvala to treat them fairly in the Morrison Land deal based on their established attorney-client relationship and her familiarity with their business goals. They approached her as an investor in the Morrison Land, and they relied on her advice as to the best way to structure the deal and the rent arrangements. They also relied on her to draft the necessary legal documents to help them accomplish their business goal of ultimately owning the Morrison Land. The Kaup brothers later expressed their gratitude for Chvala's investment on their behalf in a 2005 letter:

> It has been a great pleasure working with you. Words can not explain how proud we are of this property and THANK YOU will never be adequate for investing your money in this real estate for us. The acquisition of this property has provided a solid income base to our operation.

We find clear and convincing evidence that Wayne and Kurt expected Chvala to exercise her professional judgment for their protection when they entered into the Morrison Land deal.

### (iii) No Full Disclosure

[18] Because Chvala entered into a business deal with clients when her interests differed from theirs and the clients expected her to exercise her professional judgment for their protection, the ultimate question is whether she provided the full disclosure required by DR 5-104(A). A full disclosure

---

[34] *Id.*, 159 Ariz. at 523, 768 P.2d at 1168. *Accord In re Montgomery*, 292 Or. 796, 802, 643 P.2d 338, 341 (1982) (recognizing "[i]n many situations the client would not be dealing with the lawyer but for the client's trust and confidence in the lawyer born of past associations").

- 553 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

requires both that the client is advised there is a conflict of interest and that the client is informed of the possible areas this conflict of interest may affect.[35]

[19] A key part of a full disclosure is explaining to the client any effect the conflict may have on the exercise of the attorney's professional judgment.[36] In other words, full disclosure means explaining the nature of the conflict presented by the attorney's role in the business transaction, and also explaining to the client why he or she would benefit from independent counsel.[37] This is so because a client must be able to expect "unfettered independence of professional judgment of a lawyer whose loyalty to that person is total."[38]

[20] Thus, when a full disclosure is required under DR 5-104(A), it must include a clear explanation of the differing interests between the attorney and the client, a detailed explanation of the risks and disadvantages to the client as a result of those differing interests, and an explanation of the advantages of seeking independent legal advice.[39]

For the sake of completeness, we note the nature of the required disclosure is similar under both DR 5-104(A) and the successor rule, § 3-501.8, even though, as we discuss later, § 3-501.8(2) contains the additional requirement that the client's informed consent must be in writing. The comments to § 3-501.8 explain when a disclosure is required:

> [T]he lawyer must disclose the risks associated with the lawyer's dual role as both legal adviser and participant in the transaction, such as the risk that the lawyer will structure the transaction or give legal advice in a way that favors the lawyer's interests at the expense of the client.[40]

---

[35] *Thor, supra* note 27.

[36] See *id.*

[37] See *Fay, supra* note 19.

[38] *Id.*, 619 N.W.2d at 326.

[39] See Beck, Transactions with Clients, *supra* note 29.

[40] § 3-501.8, comment 3.

- 554 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Chvala's conduct was governed by DR 5-104(A) at the time she entered into the Morrison Land deal with the Kaup brothers, and on this record, we find she failed to provide the full disclosure required by that rule before entering into the business transaction, or at any time thereafter.

### a. Disclaimer Is Not Full Disclosure

Chvala claims that during the January 12, 2003, meeting when the key details of the Morrison Land deal were negotiated, she told Wayne and Kurt she "[could not] represent [them] in any capacity" because her husband was going to buy the Morrison Land and "God willing, he's always going to be my husband." Chvala contends this statement satisfied her ethical obligation under DR 5-104(A). We disagree, for two reasons.

[21] First, the referee did not find Chvala's testimony about this statement to be credible, and instead, the referee concluded Chvala made no such statement during the January 12, 2003, meeting. But even if we were to accept Chvala's testimony that she expressly told the Kaup brothers she could not represent them because her husband was going to be involved, such a statement, without more, would have been inadequate as a matter of law to satisfy DR 5-104(A). At best, Chvala's statement was an attempt to disclaim an attorney-client relationship with the Kaup brothers. But the full disclosure required by DR 5-104(A) is not satisfied by a mere disclaimer of an attorney-client relationship.

[22] When a lawyer enters into a business transaction with a client that falls within DR 5-104(A), it is not enough for the lawyer to merely tell the client "I cannot represent you in this transaction." DR 5-104(A) is designed to address the concern that an attorney's legal skill and training, together with the relationship of trust and confidence between the lawyer and client, create the possibility of overreaching when the lawyer participates in a business transaction with a client. This concern exists whether or not the attorney actually provides legal

- 555 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

advice or services to the client in the business transaction.[41] And because of this concern, the full disclosure required by DR 5-104(A) is substantial. It generally requires the attorney to give the client the kind of advice the client would have received if the transaction were with a stranger.[42]

The record shows that at no time during the January 12, 2003, meeting did Chvala advise Wayne and Kurt of the significant financial investment she would be making in the business transaction. Nor did she explain how that conflict of interest might affect the exercise of her professional judgment on their behalf in terms of structuring the deal, preparing the legal documents to facilitate the deal, or assisting them in accomplishing their business goals with respect to the Morrison Land. Nor did Chvala expressly advise her clients to seek independent legal advice before they agreed to the terms of the deal or explain to them why that would be advantageous to them. As such, even if we were to find credible Chvala's testimony that she made a disclaimer during the negotiations on January 12, the disclaimer she claims to have made was not sufficient to comply with DR 5-104(A). Because the Kaup brothers consented to the Morrison Land deal without the full disclosure required by DR 5-104(A), Chvala violated this disciplinary provision.

And for the sake of completeness, we also find that Chvala did not, at any time after entering into the Morrison Land deal, make the full disclosure required by DR 5-104(A). One of Chvala's primary arguments is that language in paragraph 21

---

[41] See, e.g., *Sikma, supra* note 21 (DR 5-104(A) not limited to situations where attorney formally acting as counsel in business transaction); *In re Neville, supra* note 21 (applicability of DR 5-104(A) not limited to situations in which lawyer represents client in same transaction in which interests differ).

[42] *Id.* See, also, 7A C.J.S. Attorney & Client § 354 at 398 (2015) ("[w]here an attorney enters into a business arrangement with a client, he or she must make it manifest that he or she gave to his or her client all that reasonable advice against himself or herself that he or she would have given him or her against a third person").

- 556 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

of the lease agreement satisfied DR 5-104(A). We address that argument next, and we find it meritless.

### b. Paragraph 21 in Lease Agreement

Paragraph 21 contained language stating that Chvala represented both Gary and the Kaup brothers in unrelated matters "in the past and presently" and was "not acting as an attorney for either party to this contract." There was also language stating that by signing the agreement, both parties acknowledged they "had an opportunity to have an attorney of their choosing review [the] Lease" and they were signing it voluntarily without relying on advice from Chvala. Chvala claims this language satisfied DR 5-104(A), but we disagree. The disclaimer in paragraph 21 came too late, and said too little, to satisfy the rule.

[23] To be effective, the full disclosure required by DR 5-104(A) must be made *before* the client consents to the business transaction.[43] The lease agreement containing paragraph 21 was not executed until approximately April 7, 2003. By that point, several months had passed since the Kaup brothers had consented to the material terms of the Morrison Land deal and significant portions of that business transaction had already been completed.

The full disclosure required by DR 5-104(A) needed to occur before the essential terms of the Morrison Land deal were agreed to, before Wayne and Kurt assigned their rights under the purchase agreement to Gary, and before the half section of the Morrison Land was sold to Gary. There is no question on this record that Wayne and Kurt's consent to the Morrison Land deal was given without the benefit of the full disclosure required by DR 5-104(A).

Moreover, even if the disclaimer in paragraph 21 had been given to the Kaup brothers before they consented to the

---

[43] See *Attorney Disciplinary Board v. Hamer*, 915 N.W.2d 302 (Iowa 2018) (because record did not show attorney made full disclosure to client before client consented to transaction, violation of DR 5-104(A) established).

- 557 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Morrison Land deal, the language of that disclaimer would have been insufficient as a matter of law to comply with DR 5-104(A). The language purported to disclaim an attorney-client relationship, but it did not advise Wayne and Kurt of the nature of Chvala's financial interest in the Morrison Land or explain the role she would play in the business deal. Nor did it explain how Chvala's conflict of interest might affect the exercise of her professional judgment in drafting the terms of the lease and option agreements, or in the decisions she may make as the lessor during the term of the lease. And nothing in paragraph 21 advised the clients to seek independent legal advice or explained why that would be advantageous. Because of this, paragraph 21 was insufficient to provide the "full disclosure" required by DR 5-104(A).

We find clear and convincing evidence that Chvala violated DR 5-104(A) by entering into the Morrison Land deal with Wayne and Kurt without first obtaining their consent after a full disclosure. Because Chvala violated DR 5-104(A), she also violated her oath as an attorney.[44]

### (iv) Additional Violations of DR 5-104(A)

The referee found three additional violations of DR 5-104(A). Specifically, he found Chvala committed additional violations: (1) in November 2003, when she modified the rent arrangement from a triple-net arrangement to a modified crop-share arrangement; (2) in December 2003, when ownership of the Morrison Land was transferred from Gary to TTC Enterprises; and (3) in April 2005, when TTC Enterprises transferred ownership of 5 acres of Morrison Land and granted a 10-year manure easement to Premier Pork, all without providing full disclosure.

From a disciplinary standpoint, it is immaterial whether Chvala's conduct in modifying the Morrison Land deal is analyzed as four separate business transactions with clients or

---

[44] See Neb. Rev. Stat. § 7-104 (Reissue 2012).

- 558 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

whether her conduct is instead characterized as ongoing evidence of an impermissible business transaction to which the clients never consented after full disclosure. Either way, the record contains clear and convincing evidence that from and after January 12, 2003, when Chvala entered into the Morrison Land deal with Wayne and Kurt, she and her clients had differing interests in the deal, her clients expected her to exercise her professional judgment for their protection, and her clients consented to the original business transaction, and to all subsequent modifications of that business transaction, without the full disclosure required by DR 5-104(A).

### (d) § 3-501.8

Chvala was also charged with violating § 3-501.8, the successor to DR 5-104(A). The referee found Chvala did not violate § 3-501.8(a), but did violate § 3-501.8(b). We reach the same conclusion on de novo review.

### (i) § 3-501.8(a)

Section 3-501.8(a) provides: "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client," unless certain conditions are met. The referee found that Chvala did not "enter into" any new business transactions with the Kaup brothers after September 1, 2005, and thus concluded that § 3-501.8(a) was not violated. Counsel for Discipline has not taken exception to this finding, and we agree the record does not show that Chvala entered into any new or additional business transactions with clients after September 1, 2005. However, as we discuss below, her continued participation in an impermissible business transaction with clients resulted in other disciplinary violations.

### (ii) § 3-501.8(b)

Section 3-501.8(b) provides: "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules." Comments

- 559 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

to the rule explain its underpinnings and provide some practical examples:

> Use of information relating to the representation to the disadvantage of the client violates the lawyer's duty of loyalty. [Section 3-501.8(b)] applies when the information is used to benefit either the lawyer or a third person, such as another client or business associate of the lawyer. For example, if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client or to recommend that another client make such a purchase.[45]

The referee found Chvala violated § 3-501.8(b) by "intentionally lull[ing] the Kaups into believing they had exercised the option so that the option deadline would pass." Specifically, the referee found:

> [Chvala] knew everything about the Kaups' farming and hog finishing operations. She knew as a result of her prior representation that the Kaups had structured their businesses around their ultimate ownership of the entire section of the Morrison Land. She knew they had borrowed substantial sums to build and develop the hog finishing buildings and were dependent on her half-section to make the entire operation financially feasible. She knew that the Kaups would have to meet her financial demands or risk losing their entire farming and livestock business. [Chvala] used information relating to her representation of the Kaups to their disadvantage, and the Kaups never gave her informed consent to do so.

On de novo review, we agree there is clear and convincing evidence that in 2012, Chvala used information acquired during her representation of the Kaup brothers and their entity Premier Pork in a way that disadvantaged those clients. She knew the Kaup brothers had invested significant sums in

---

[45] § 3-501.8, comment 5.

- 560 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

developing the 10 acres of Morrison Land they already owned, and she knew that ownership of the remaining half section of Morrison Land owned by TTC Enterprises was integral to the success of their business model. She also knew the Kaup brothers had the ability to pay a premium for the property and likely would do so rather than risk losing their investment. And she used this information to secure a personal financial benefit for herself, her husband, and their corporation. In doing so, she violated § 3-501.8(b), and because she violated that rule, she also violated her oath as an attorney as set out in § 7-104.

### 3. Chvala Represented Clients With Differing Interests

Chvala was also charged with violating both Canon 5, DR 5-105, of the Code of Professional Responsibility, and Neb. Ct. R. of Prof. Cond. § 3-501.7 (rev. 2019) by representing clients with differing or conflicting interests without obtaining informed consent. We have already determined that Chvala simultaneously represented the owners-lessors and the lessees of the Morrison Land. And we agree with the referee that this representation violated both DR 5-105 and § 3-501.7. We address each violation in turn.

### (a) DR 5-105

DR 5-105 is entitled "Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer." DR 5-105 governed Chvala's conduct before September 1, 2005, and provides in part:

> (A) A lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5-105(C).

- 561 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

(B) A lawyer shall not continue multiple employment if the exercise of his or her independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in representing differing interests, except to the extent permitted under DR 5-105(C).

(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that the lawyer can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his or her independent professional judgment on behalf of each.

### (i) Chvala's Clients Had Differing Interests

[24,25] Under DR 5-105, a lawyer may represent several clients whose interests are not actually or potentially differing, but should nevertheless explain any circumstances that might cause a client to question the lawyer's undivided loyalty.[46] And if a lawyer is asked to undertake or continue representation of multiple clients having potentially differing interests, "the lawyer must weigh carefully the possibility that his or her judgment may be impaired or his or her loyalty divided if he or she accepts or continues the employment."[47]

Here, for the same reasons we previously found that Chvala's interests as an owner-lessor actually differed from the interests of Wayne and Kurt as lessees and prospective purchasers, we now find that the interests of all the other owners-lessors differed from those of Wayne and Kurt, and their entity Premier Pork. Because of these differing interests, Chvala's simultaneous representation of all the owners-lessors of the Morrison

---

[46] Canon 5, EC 5-19, of the Code of Professional Responsibility.

[47] Canon 5, EC 5-15, of the Code of Professional Responsibility.

- 562 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Land, and all the lessees of the Morrison Land, was likely to involve her in representing differing interests in the same transaction. Moreover, even among the lessors there were differing interests, because one of the lessors was an entity that Chvala owned and her husband managed, and that personal relationship could adversely affect her independent professional judgment on behalf of other clients. As such, Chvala was required to comply with DR 5-105(C) and obtain informed consent from all clients.

### (ii) Chvala Did Not Obtain Her
### Clients' Informed Consent

[26] A lawyer may represent multiple clients with differing interests if (1) it is obvious the lawyer can adequately represent the interest of each and (2) if each client consents to the representation after full disclosure of the possible effect of such representation on the exercise of his or her independent professional judgment on behalf of each.[48] Here, we do not address the first of these two elements, because on this record we find no evidence whatsoever that Chvala provided any client in the Morrison Land transactions with the full disclosure required by DR 5-105(C).

[27-29] Even in those instances where a lawyer is justified in representing two or more clients having differing interests, "it is nevertheless essential that each client be given the opportunity to evaluate his or her need for representation free from any potential conflict and to obtain other counsel if he or she so desires."[49] Thus, "before a lawyer may represent multiple clients, the lawyer should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."[50] And "[i]f there are present other circumstances that might cause any of

---

[48] DR 5-105(C).

[49] Canon 5, EC 5-16, of the Code of Professional Responsibility.

[50] Id.

- 563 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

the multiple clients to question the undivided loyalty of the lawyer, he or she should also advise all of the clients of those circumstances."[51] A full disclosure under DR 5-105 requires the attorney to not only inform the client of the attorney's relationship with other clients, but also to explain the pitfalls that may arise in the course of the transaction that would make it desirable for the client to have independent counsel.[52]

There is no evidence that Chvala provided any client in the Morrison Land transactions with the full disclosure required by DR 5-105(C). We therefore agree with the referee that Chvala violated DR 5-105. And because she violated DR 5-105, she also violated her oath as an attorney as set out in § 7-104.

### (b) § 3-501.7

Section 3-501.7 is entitled "Conflict of interest; current clients." Section 3-501.7 governed Chvala's conduct after September 1, 2005, and provides:

(a) Except as provided in paragraph (b) . . . , a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

---

[51] *Id.*

[52] *Supreme Court Atty. Disc. Bd. v. Clauss*, 711 N.W.2d 1 (Iowa 2006).

- 564 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

We find clear and convincing evidence that from September 1, 2005, until Chvala terminated her attorney-client relationship with Wayne and Kurt on March 12, 2013, she continued to simultaneously represent all of the owners-lessors of the Morrison Land and all of the lessees-prospective purchasers of that land. This simultaneous representation continued even though there was no evidence Chvala prepared additional legal documents or offered specific legal advice pertaining to the Morrison Land transactions after September 1, 2005.

During this time, the parties continued operating under the lease and option agreements Chvala had prepared, and at all relevant times, and particularly after the option period opened in 2010, the competing and conflicting interests of Chvala's clients remained directly adverse to one another, amounting to a concurrent conflict of interest under § 3-501.7(a).

[30] There is no need to analyze whether, notwithstanding this concurrent conflict of interest, it may have been permissible for Chvala to represent these competing interests under § 3-501.7(b)(1) through (3), because it is clear from the record that no client was provided informed consent, confirmed in writing, as required by § 3-501.7(b)(4). For purposes of § 3-501.7:

> Informed consent requires that *each affected client* be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. . . . The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the

- 565 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved.[53]

Here, there is no evidence that after September 1, 2005, Chvala discussed, with any of the affected Morrison Land clients, the ways in which her common representation of their conflicting interests could have adverse effects on the interest of that client, including possible effects on loyalty and confidentiality. Nor is there any evidence Chvala obtained informed consent, in writing, from any Morrison Land client. She thus violated § 3-501.7, and because she violated that rule, she also violated her oath as an attorney as set out in § 7-104.

### 4. Chvala's Dishonesty and Deceit

#### (a) § 3-508.4

Chvala was charged with violating Neb. Ct. R. of Prof. Cond. § 3-508.4 (rev. 2016). Section 3-508.4 is entitled "Misconduct" and provides in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct[,] knowingly assist or induce another to do so or do so through the acts of another;

. . . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]

[31,32] One of the essential eligibility requirements for admission to the practice of law in Nebraska is the ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships and with respect to all legal obligations.[54] As such, this court "'does not look kindly upon acts which call into question an attorney's

---

[53] § 3-501.7, comment 18 (emphasis supplied).

[54] *State ex rel. Counsel for Dis. v. Council*, 289 Neb. 33, 853 N.W.2d 844 (2014).

- 566 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

honesty and trustworthiness.'"[55] Attorneys who engage in dishonest or deceitful conduct in their communications with clients violate § 3-508.4(c).[56]

The referee found that Chvala engaged in a pattern of dishonest and deceitful conduct regarding the Kaup brothers' attempts to close on the sale of the half section of Morrison Land and that she did so "for the sole purpose of enriching herself at their expense." Specifically, the referee found:

From at least November 2012, it was [Chvala's] plan to delay the Kaups from providing written notice of their exercise of the option until after March 1, 2013. She knew that this was her only chance of getting any of the appreciated value of the land. [Chvala] intentionally misled Kurt in November 2012, when she told him that she would close the sale in December. Instead of telling Kurt that his oral exercise of the option was insufficient, she implied that she had no objection to closing, but only that she couldn't get to it until December. By her statement, [Chvala] was able to put Kurt off for at least a month.

. . . .

When [Chvala] was informed by [the bank] that the Kaups wanted to close the deal with her, [Chvala said] she couldn't get it done in December and it is looking more toward March for a closing date. This was [Chvala's] critical delay tactic. Without having to talk to Wayne or Kurt she was able to convey to them that she

---

[55] *Id*. at 43, 853 N.W.2d at 852.

[56] See, *State ex rel. Counsel for Dis. v. Thomas*, 281 Neb. 336, 799 N.W.2d 661 (2011) (attorney engaged in conduct involving dishonesty and deceit by avoiding client calls and falsely reassuring clients to avoid admitting client's case had been dismissed); *State ex rel. Counsel for Dis. v. Simmons*, 270 Neb. 429, 703 N.W.2d 598 (2005) (attorney engaged in conduct involving dishonesty and deceit as result of deceptive communications with client and law enforcement about whether and where attorney was holding client's money).

- 567 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

would get to the closing, but it wouldn't be until March. [The Kaup brothers] relied on [Chvala's] statement and thus were lulled into believing that there was no need to contact [Chvala] in January or February because she wasn't going to get to it until March.

On de novo review, we agree with the referee that Chvala was fully aware of Wayne and Kurt's efforts to close on the half section of the Morrison Land beginning in November 2012 and that she deliberately misrepresented her intentions regarding such a closing. She did so in an effort to delay the closing without alerting the Kaup brothers to the fact they had not strictly complied with the terms of the option agreement.

It is clear from the record that Chvala and Gary intended to strictly enforce the option terms and did not believe the Kaup brothers had correctly exercised the option. In fact, before the option expired, Chvala sought a legal opinion from a colleague on whether the option was enforceable and whether it could be exercised through oral notice rather than written notice. But when it became clear that Wayne and Kurt were trying to proceed with a closing on the half section of the Morrison Land, Chvala instead made statements that were designed to mislead her clients and others into believing that she and Gary intended to proceed with the closing, but could not do so until later. Chvala's statements in this regard were dishonest, deceptive, and misrepresented her true intentions.

We note Chvala argues throughout her brief that decisions regarding the Morrison Land, including the decision whether to require strict compliance with the option terms, were Gary's decisions, not hers. In this respect, her brief contends, "Chvala stood by her husband. His decision was to hold the Kaups to their written Agreements. She had no right to 'overrule' Gary and no right to contradict him."[57] But this argument is premised on her claim, which we have found lacks merit, that she played no role in the negotiation and lease of the half section

---

[57] Brief for respondent at 39.

- 568 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

of the Morrison Land. And in any event, even if the decision was Gary's, the misrepresentations and deceitful responses were hers.

We find clear and convincing evidence that Chvala violated § 3-508.4(c) by engaging in conduct involving dishonesty, deceit, and misrepresentation regarding her intentions to close on the sale of the Morrison Land. And because we find she violated other Nebraska Rules of Professional Conduct, we also find clear and convincing evidence she violated § 3-508.4(a). Further, by violating these rules, she also violated her oath as an attorney as set out in § 7-104.

## (b) § 3-501.4

Neb. Ct. R. of Prof. Cond. § 3-501.4 is entitled "Communications" and provides in relevant part:

(a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;

. . . .

(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The referee found that Chvala violated § 3-501.4 in 2012 and 2013 for largely the same reasons she was found to have engaged in deceitful and dishonest conduct under § 3-501.8, i.e., because she "failed to communicate with Wayne and Kurt about the limits of her representation" when she knew they were attempting to exercise the option and proceed with the closing.

Chvala takes exception to this finding and generally argues that she had no ethical duty to communicate with the Kaup

- 569 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

brothers regarding the sale of the half section of the Morrison Land, because she had no attorney-client relationship with them in that matter. We have already rejected this argument as factually and legally incorrect. For the same reasons we previously found that Wayne and Kurt were Chvala's clients in matters related to the Morrison Land for purposes of DR 5-105 and § 3-501.7, we similarly find they were Chvala's clients for purposes of § 3-501.4. As such, from and after September 1, 2005, Chvala was obligated to promptly inform Wayne and Kurt of any circumstance with respect to which their informed consent was required under the disciplinary rules, to consult with them about any relevant limitation on Chvala's conduct when she knew they expected her assistance, and to explain matters to the extent reasonably necessary to permit them to make informed decisions regarding the representation.

As previously stated, Chvala was aware the Kaup brothers were actively trying to close on the half section of the Morrison Land, and she knew Wayne and Kurt expected her assistance to complete the closing. Despite this knowledge, Chvala did not contact the Kaup brothers to provide the full disclosure she should have provided earlier, to explain the limitations on her conduct, or to encourage them to seek independent counsel on the matter before the option expired. Instead, Chvala actively avoided their attempts to communicate with her and deliberately frustrated their efforts to schedule a closing before the option period expired. For these reasons, we find clear and convincing evidence that Chvala violated § 3-501.4, and because she violated this rule, she also violated her oath as an attorney as set out in § 7-104.

## V. SANCTION

Having found by clear and convincing evidence that Chvala violated DR 5-104(A) and DR 5-105 of the former Code of Professional Responsibility, and §§ 3-501.4, 3-501.7, 3-501.8, and 3-508.4 of the Nebraska Rules of Professional Conduct, as well as her oath as an attorney as set out in § 7-104, we turn to the question of the appropriate sanction. The referee

- 570 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

recommended disbarment. Chvala takes exception to that rec-ommendation. She argues that dismissal of the charges is the proper outcome and that "Even A Public Reprimand Is Too Harsh."[58]

[33-35] With respect to the imposition of attorney discipline, each attorney discipline case must be evaluated in light of its particular facts and circumstances.[59] For purposes of deter-mining the proper discipline of an attorney, we consider the attorney's actions both underlying the events of the case and throughout the proceeding, as well as any aggravating or miti-gating factors.[60] The propriety of a sanction must be considered with reference to the sanctions imposed in prior similar cases.[61]

## 1. Relevant Factors

[36] To determine whether and to what extent discipline should be imposed in an attorney discipline proceeding, we consider the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the pub-lic, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law.[62]

### (a) Nature of Offense

In this case, Chvala committed multiple, serious viola-tions, all of which implicate the foundational principles of client loyalty and trust. The relationship of attorney and cli-ent has always been recognized as one of special trust and confidence.[63] While the law does not strictly prohibit business

---

[58] Brief for respondent at 39.

[59] See *Jorgenson, supra* note 3.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *State, ex rel. Nebraska State Bar Ass'n, v. Basye*, 138 Neb. 806, 295 N.W. 816 (1941).

- 571 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

transactions between an attorney and a client, it does impose the requirement that they be characterized by full disclosure and honesty.[64] Here, Chvala completely disregarded those requirements, and her clients suffered as a result.[65]

Chvala entered into the deal to purchase the half section of the Morrison Land, a transaction in which her interests clearly differed from her clients' interests, without obtaining her clients' consent after full disclosure. Chvala also impermissibly represented multiple clients with directly competing interests in multiple transactions related to the Morrison Land, without providing full disclosure. But most egregious of all, Chvala took advantage of her clients' trust, misrepresented her intentions in the business deal, and engaged in conduct that was dishonest and deceitful in order to realize personal financial gain at the expense of her clients.

[37] Moreover, although all of the violations stemmed from the same prohibited business transaction with clients, the violations were neither technical nor isolated. Instead, the prohibited business transaction continued for a period of 10 years and the resulting ethical violations were serious and ongoing. Chvala's failure to carefully follow the disciplinary rules when entering into that business transaction, and her decision to remain in that business transaction for the next 10 years and provide legal services to all participants in that matter, resulted in cumulative acts of misconduct under the Nebraska disciplinary code and rules. Cumulative acts of attorney misconduct are distinguishable from isolated incidents, therefore justifying more serious sanctions.[66]

### (b) Need for Deterring Others

This case provides a textbook example of the ethical minefield that is laid when an attorney enters into a business

---

[64] See *id.*

[65] See *id.*

[66] *State ex rel. Counsel for Dis. v. Trembly*, 300 Neb. 195, 912 N.W.2d 764 (2018).

- 572 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

transaction with clients whose interests are adverse, without providing the full disclosure required by the ethical rules. When considering the deterrence factor, the referee observed:

> This is a case in which long-standing clients relied on their attorney to treat them fairly and honestly. Many lawyers, especially in rural areas, can relate to [the] type of practice [Chvala] had where there are close professional and personal relationships with clients. [Chvala] had a casual attitude toward her clients who trusted her in all respects. Others, especially those in similar types of practice, must be deterred from the kind of misconduct [Chvala] engaged in.

We agree there is a strong need to deter other attorneys from taking a casual approach to compliance with the disciplinary rules that govern business transactions with clients. Similarly, there is a strong need to deter lawyers from taking a relaxed approach to representing multiple clients with differing interests in the same transaction. Chvala argues that "'[c]onflicts of interest are a routine part of practice in rural Nebraska,'"[67] and we do not doubt that reality. But it underscores, rather than excuses, a lawyer's responsibility to carefully monitor and fully disclose any conflicts of interest before proceeding further. Here, Chvala paid only lip service to some conflicts of interest and ignored others altogether.

Finally, we must send a strong message that taking advantage of a client's trust for personal gain is an egregious violation of the disciplinary rules and one that must be strongly deterred.

### (c) Reputation of Bar

[38,39] Violations of client trust and loyalty, particularly when they result in personal financial gain to the attorney, harm the reputation of the entire legal profession by undermining public confidence and trust in attorneys, in the courts, and

---

[67] Brief for respondent at 33.

- 573 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

in the legal system generally.[68] There is a need to preserve the public trust and confidence in members of the bar.[69] Among the major considerations in determining whether a lawyer should be disciplined is maintenance of the highest trust and confidence essential to the attorney-client relationship.[70] As a profession, the bar continuously strives to build and safeguard such trust and confidence.[71]

Despite the fact that Chvala has been a highly respected member of the bar for more than 30 years, her misconduct in this case was egregious and ongoing, and her violations of client trust and loyalty resulted in significant financial consequences and served to undermine confidence in the legal profession.

### (d) Protection of Public

[40] The goal of attorney discipline proceedings is not as much punishment as a determination of whether it is in the public interest to allow an attorney to keep practicing law.[72] Providing for the protection of the public requires the imposition of an adequate sanction to maintain public confidence in the bar.[73]

When considering this factor, the referee remarked:

Part of what makes this case particularly tragic, in addition to the great loss to Wayne and Kurt . . . , is that [Chvala] enjoyed a sterling public reputation as reflected by the letters of reference and commendation from a wide variety of people, including fellow lawyers, members of the community, students, philanthropists and people who benefitted from [Chvala's] charitable giving and

---

[68] See *Nimmer, supra* note 1.

[69] *State ex rel. Counsel for Dis. v. Cording*, 285 Neb. 146, 825 N.W.2d 792 (2013).

[70] *Id.*

[71] *Id.*

[72] *Nimmer, supra* note 1.

[73] *Id.*

- 574 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
State ex rel. Counsel for Dis. v. Chvala
Cite as 304 Neb. 511

civic involvement. Those positives are outweighed by the need to protect the public from being harmed by the most skilled and talented of lawyers who are held in high esteem by the public and completely trusted by their clients.

The record confirms that Chvala is held in high regard as both a skilled lawyer and a community leader. We agree that her reputation and contributions to the legal profession are mitigating factors in this disciplinary action. But they do not outweigh the aggravating factor that, in the Morrison Land matter, Chvala ultimately used her legal skills and reputation to take advantage of the loyalty and trust of her clients for her personal gain. As a result, her moral fitness to engage in the practice of law is implicated.[74]

### (e) Attitude of Respondent

Chvala initially self-reported to the Counsel for Discipline, and this is a mitigating factor we consider. But we cannot overlook the aggravating factor that during the evidentiary hearing, Chvala displayed an attitude of defiance and avoidance and showed no remorse for her misconduct. We also find very troubling the fact that the referee found some of Chvala's testimony to be "implausible and not credible" and expressly stated that "[t]hroughout these proceedings" Chvala "testified falsely, and refused to accept responsibility for her actions." Our de novo review of the record supports these findings, and we see no reason to discount the referee's finding that Chvala's "lack of credibility in these proceedings [was] egregious."

### (f) Present or Future Fitness to Practice Law

The record shows Chvala is a highly capable and successful lawyer. It also shows that she consistently either disregarded or materially misconstrued the ethical rules that govern entering into a business transaction with clients and representing

---

[74] See *Basye, supra* note 63.

- 575 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

multiple clients in the same transaction. Chvala adamantly denied having an attorney-client relationship with any of the people or entities involved in the Morrison Land transactions, despite overwhelming evidence to the contrary.

We are particularly troubled by Chvala's repeated efforts to deny involvement in and avoid responsibility for preparing the deeds, leases, option agreements, and easements that governed the various Morrison Land transactions. Her testimony in that regard was evasive, and it evolved to meet the exigency of the questioning. It may have been an inconvenient truth that she was the lawyer who prepared all of the relevant legal documents for all of the parties involved in the Morrison Land transactions, but her reluctance to admit that truth and take full responsibility as a supervising lawyer demonstrates an inability and an unwillingness to comply with disciplinary rules governing attorneys and calls into question her fitness to practice law.

### 2. Comparison of Similar Cases

Each attorney disciplinary proceeding is unique, but the propriety of a sanction must be considered with reference to the sanctions this court has imposed in prior similar cases.[75] We have reviewed our case law and have found no prior cases that involve disciplinary violations relating to entering into business transactions with clients and representing multiple clients with differing interests in that transaction, as well as conduct involving deceit and dishonesty and failure to communicate. In that respect, this case stands alone. But we find guidance in several prior cases where lawyers have entered into improper business transactions with clients and/or have engaged in misconduct involving deceit and dishonesty.

[41] In *State ex rel. NSBA v. Thor*,[76] clients in financial difficulty hired an attorney. The attorney advised them to file

---

[75] *Jorgenson, supra* note 3.

[76] *Thor, supra* note 27.

- 576 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
304 NEBRASKA REPORTS
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

bankruptcy, and he encouraged them to list their only major asset, some farmland, with a realty company that was both a client of the attorney and was owned by the attorney's father. The attorney then used information he learned during his representation of those clients to purchase the farmland for less than an offer made by a disinterested third party. In the course of doing so, he actively mislead his clients and failed to disclose his conflict of interest in the land purchase. We found the attorney had entered into a business relationship with his clients without making full disclosure and had engaged in misconduct and deceit. In considering the appropriate discipline, we noted the conduct had "brought doubt into the minds of many as to the competence of the legal profession to represent a client's best interests,"[77] and we concluded the violation was therefore very serious. We noted, however, that the attorney had otherwise performed competently, even for these clients, and had exhibited great remorse for his conduct. We ultimately ordered the attorney suspended for 1 year.

In *State ex rel. NSBA v. Miller*,[78] an attorney was hired by a woman who was both a former employee and a former client to obtain a refund of an excess insurance payment. The attorney orally agreed to charge a 20-percent contingent fee, but the written fee arrangement subsequently executed by the client stated the attorney would be paid one-third of the amount obtained if settlement was reached before filing suit and 40 percent of the amount obtained after suit was filed. Despite this express language in the written agreement, the attorney assured his client that the oral agreement of a 20-percent contingent fee was binding.

The attorney spent approximately 6 hours attempting to recover the overpayment. Then, the party holding the funds contacted the attorney and notified him it intended to return the overpayment. Despite this assurance, the attorney filed suit

---

[77] *Id.*, 237 Neb. at 752, 467 N.W.2d at 678.

[78] *State ex rel. NSBA v. Miller*, 258 Neb. 181, 602 N.W.2d 486 (1999).

- 577 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

against that party approximately 2 hours later. And after the suit was settled and the overpayment was returned, the attorney attempted to collect 40 percent of the settlement from his client, relying on the written fee agreement. The total fee charged was $96,000.

We found the attorney, among other things, had engaged in conduct involving fraud and deceit, both with respect to his client and throughout the disciplinary proceedings. We noted that he had previously represented the client and that thus, she had significant trust in him. We emphasized that although the evidence was to the contrary, the attorney continued to insist he had done nothing wrong. We also noted this was the attorney's second disciplinary proceeding. In the prior proceeding, the attorney had been suspended from the practice of law for a period of 2 years. Because of the cumulative acts of attorney misconduct and the inexcusable and egregious nature of the charges, we concluded disbarment was the appropriate sanction.

[42] In *State ex rel. Counsel for Dis. v. Crawford*,[79] the alleged disciplinary violations were not analogous to the instant case, as the attorney was being charged with client neglect. The case is notable, however, for the fact that counsel was "antagonistic, evasive, and untruthful throughout the investigation and the disciplinary proceeding."[80] We were particularly concerned with counsel's lack of veracity during the proceedings, noting:

> This court does not look kindly upon acts which call into question an attorney's honesty and trustworthiness. The essential eligibility requirements for admission to the practice of law in Nebraska include "[t]he ability to conduct oneself with a high degree of honesty, integrity, and trustworthiness in all professional relationships

---

[79] *State ex rel. Counsel for Dis. v. Crawford*, 285 Neb. 321, 827 N.W.2d 214 (2013).

[80] *Id*. at 329, 827 N.W.2d at 223.

- 578 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

and with respect to all legal obligations." With or without misappropriation, acts of dishonesty can result in disbarment.[81]

### 3. Sanction of Disbarment

Here, Chvala entered into a business transaction with established clients without providing the full disclosure required by the disciplinary rules. Thereafter, she stayed in the business deal as an investor, while simultaneously providing legal advice and services to all of the lessors and lessees of the Morrison Land, despite their differing interests. Chvala paid only passing lip service to the full disclosure requirements, and she never provided the full disclosure required by the disciplinary rules. Finally, and most egregiously, Chvala capitalized on her clients' trust by deliberately deceiving and misleading them into believing a closing would take place without any further action on their part, in order to obtain personal financial gain.

When confronted with her wrongdoing, Chvala insisted she had not entered into the business transaction at all, insisted the Kaup brothers were not clients, and denied providing any legal representation regarding the Morrison Land. She has refused to acknowledge any misconduct whatsoever, has shown no remorse for her conduct, and has presented testimony that was at best implausible and, according to the referee, patently false.

Despite an otherwise unblemished legal career, Chvala's misconduct was egregious and requires a strong disciplinary response from this court. It is therefore the judgment of this court that the appropriate sanction for Chvala's violations is disbarment.

### VI. CONCLUSION

Given clear and convincing evidence that Chvala violated Nebraska's Code of Professional Responsibility and the

---

[81] *Id*. at 367, 827 N.W.2d at 246-47.

- 579 -

Nebraska Supreme Court Advance Sheets
304 Nebraska Reports
STATE EX REL. COUNSEL FOR DIS. v. CHVALA
Cite as 304 Neb. 511

Nebraska Rules of Professional Conduct, as well as her oath of office, it is the judgment of this court that she be disbarred from the practice of law in the State of Nebraska, effective immediately. She is directed to comply with Neb. Ct. R. § 3-316 (rev. 2014), and upon failure to do so, she shall be subject to punishment for contempt of this court. She may not apply for reinstatement for a period of at least 5 years[82] and must successfully complete the Multistate Professional Responsibility Examination prior to submitting any application for reinstatement.

JUDGMENT OF DISBARMENT.

CASSEL, J., not participating.

---

[82] See Neb. Ct. R. § 3-310(T) (rev. 2019).